# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **DERRIN BOYD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **NATIONAL COLLEGIATE ATHLETIC** | ) | **COMPLAINT – JURY DEMAND** |
| **ASSOCIATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

1. Plaintiff Derrin Boyd brings this action to challenge Bylaws 12.8.1 and 12.8.1.1 (the "NAIA Eligibility Limitation Bylaws") of Defendant, the National Collegiate Athletic Association ("NCAA" or "Defendant"). These bylaws reduce the number of years former National Association of Intercollegiate Athletics ("NAIA") college basketball players can play NCAA Division I basketball after transferring to an NCAA Division I school from an NAIA school, and unjustifiably restrains the ability of these college athletes to earn money through use of their name, image, and likeness ("NIL") connected to their work as an NCAA Division I basketball player. Additionally, Plaintiff brings this action to challenge Bylaw 12.8.1.7 (the "Five-Year Rule Waiver") of Defendant as it arbitrarily and inconsistently restrains the number of years college basketball players can play NCCA Division I basketball following involuntary interruptions to their athletic careers due to extenuating circumstances, particularly NAIA transfer students. This action seeks declaratory, injunctive, and monetary relief against Defendant for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and the Tennessee Trade Practices Act ("TTPA"), Tenn. Code Ann. § 47-25-101.

1

## **INTRODUCTION**

2.     Mr. Boyd is a highly accomplished and dynamic college basketball player with the talent and credentials to compete at the highest levels of the sport. After earning back-to-back Mid-South Conference First Team honors and leading Georgetown College to top seeds in consecutive NAIA Tournaments, he transitioned seamlessly to NCAA Division I basketball. At Lipscomb University, he became the leading scorer among guards, earning All-ASUN Second Team honors before a season-ending injury. He returned to form the following year at the College of Charleston, where he led the team in scoring and was named to the All-CAA Third Team. Mr. Boyd has consistently demonstrated that he can elevate the programs he joins—regardless of level—and is widely recognized as a high-impact player with real potential to play professionally.

3.     Mr. Boyd plays one of the most valuable positions in college basketball: scoring guard. Players with his profile—proven offensive output, efficiency, and positional versatility— are especially sought after in today's NIL-driven era, where athletic performance directly translates to financial opportunity and program visibility. Mr. Boyd had been actively recruited by multiple NCAA Division I programs, including Vanderbilt University, which extended an offer for him to join its 2025-26 roster along with an NIL compensation package valued at approximately $350,000. However, due to the NCAA's denial of a waiver under its own self-governing eligibility rules— rules that arbitrarily restrict athletes who began their collegiate careers at non-NCAA institutions— Mr. Boyd has lost the opportunity to compete for Vanderbilt. Because the institution was forced to give away his spot due his restricted eligibility, Mr. Boyd lost the opportunity to participate in what would have been the most impactful season of his collegiate and NIL career. Currently, Mr. Boyd has various 2025-26 roster spot offers from other Division I institutions, linked to opportunity for NIL compensation, that are contingent on the restoration of his eligibility. Without judicial intervention, he will also lose these offers and opportunities for NIL compensation, facing

2

exclusion from the competitive college basketball marketplace at the peak of his value and athletic potential.

4.	In 2021, a unanimous Supreme Court held in *Nat'l Collegiate Athletic Ass'n v. Alston,* 594 U.S. 69 (2021), that student-athletes may receive compensation for their name, image, and likeness. *Id. at* 81. Since the NCAA's founding in 1905, "[s]chools across the country sought to leverage sports to bring in revenue, attract attention, boost enrollment, and raise money from alumni." *Id.* at 76. College sports were found not just to be a "student's game," but an "organized commercial enterprise" extending the market that once was thought to be for student-athletes alone. *Id.* With this in mind, the Court denied the NCAA "immunity from the normal operation of the antitrust laws." *Id.* at 74.

5.	In response, in June 2021, the NCAA lifted its prohibition on NCAA Division I athletes receiving NIL compensation. In the last four years, NIL revenue-sharing and individual compensation for NCAA Division I basketball players has grown drastically, with men's basketball receiving the highest per-player amount of all NCAA sports.[1]

6.	The NCAA's NAIA Eligibility Limitation Bylaws grant only five years for student-athletes to complete their residency at the NCAA level. In the name of advancing student-athletes' academic development, the five-year period ignores the more rigorous academic programs that require more than five years to complete, such as dual bachelors' degrees and combined undergraduate-graduate degrees. Additionally, the NCAA's five-year period defies what the organization itself declares as a successful time period to complete student-athletes' residencies at

---

[1] NCAA Revenue Sharing & NIL Estimates, https://nil-ncaa.com/.

NCAA institutions. The NCAA celebrates a six-year period as a success for student-athletes to complete their regular undergraduate degree.[2]

7.  Additionally, the NCAA's NAIA Eligibility Limitation Bylaws start student-athletes' Eligibility Clock[3] prior to their start at an NCAA member institution. A player's NCAA Eligibility Clock starts at his enrollment in *any* full-time college or university, including non-NCAA institutions. Under the current bylaws, any years a student-athlete spends enrolled at an NAIA institution are subtracted from his NCAA Division I Eligibility Clock, even if he did not compete in NAIA athletics. As a result, students who transfer from an NAIA school to an NCAA program are arbitrarily limited compared to their non-transfer counterparts. As a result, athletes—like Mr. Boyd—who attended and played at an NAIA institution are restricted in their opportunities to play at the top competitive level of Division I college basketball and earn NIL compensation.

8.  The NCAA's Five-Year Rule Waiver offers student-athletes an opportunity to extend their eligibility beyond the standard five-year limit in cases of extenuating circumstances, such as injuries, military service, or disruptions like the COVID-19 pandemic. This waiver is purported to address all extenuating circumstances that interrupt athletes' opportunity to compete and earn NIL compensation. However, the bylaw is inconsistently and arbitrarily applied, often failing to actually address the harm caused by individual circumstances and real-world factors; this ultimately leads to unequal and unpredictable outcomes. This inflexible standard not only sidelines deserving athletes, like Mr. Boyd, but also artificially shrinks the talent pool, limits access to NIL

---

[2] Sanquandra Health, *DI Graduation Rates Remain at Highest Level,* NCAA, Nov. 20, 2024, https://www.ncaa.org/news/2024/11/20/media-center-di-graduation-rates-remain-at-highest-level.aspx.

[3] NCAA Bylaw 12.8 defines a player's "Eligibility Clock" as the period of time—typically five years for Division I athletes—during which a student-athlete is allowed to compete in four seasons of their sport, starting from the moment they enroll full-time in a college or university.

opportunities during athletes' peak earning potential, and takes away from fair competition across the NCAA.

9. Critically, due to the unique market at issue, NIL compensation is effectively available only to NCAA Division I athletes—not NAIA athletes. The NCAA's NAIA Eligibility Limitation Bylaws and the Five-Year Rule Waiver unreasonably restrain NAIA transfer students and students who experienced interruption to their career due to extenuating circumstances. These student-athletes are barred from having the equivalent opportunity to earn NIL compensation as their counterparts who attend NCAA member institutions for the typical four consecutive year period. In the post-*Alston* era, the negative impact these restraints have on student-athletes, NCAA member institutions, and consumers is significantly amplified.

10. These rules neither improve competition nor benefit any active participant in the relevant labor market for athletic services in men's Division I basketball. *Alston,* 594 U.S at 81. Rather, these rules stifle competition in the labor market for NCAA Division I men's basketball by unreasonably restraining college athletes and NCAA member institutions while simultaneously degrading the quality of Division I men's basketball available for consumption by the viewing public.

11. On December 23, 2024, following the court's ruling in *Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024), the NCAA Division I Board of Directors issued a blanket waiver designed to extend eligibility for athletes who had competed at non-NCAA institutions, like Mr. Boyd.[4] However, the NCAA denied Mr. Boyd's request for this waiver

---

[4] NCAA Division I Board of Directors Waiver Guidance for 2025-26 Eligibility, Question and Answer Document, https://ncaaorg.s3.amazonaws.com/committees/d1/board/2025-26D1BOD_WaiverEligibilityQA.pdf.

5

because his arbitrary five-year Eligibility Clock had already expired and the NCAA decided he did not demonstrate any extraordinary circumstances warranting further relief.

12.     But for the NCAA's Five-Year Rule, Mr. Boyd would have qualified for the post-*Pavia* waiver. The Five-Year Rule started Mr. Boyd's Eligibility Clock in 2020, when he was a student at an NAIA school. During the 2020-2021 season, Mr. Boyd and other non-NCAA students (including NAIA transfer students) received a COVID exemption to pause the number of seasons they could play—*not* the number of years counting toward their Eligibility Clock. Meanwhile, students who were at NCAA Division I institutions received the COVID exemption to pause the number of seasons *and* the number of years on their Eligibility Clock. Therefore, starting Mr. Boyd's Eligibility Clock while he attended an NAIA institution did not allow him to receive the same waiver that NCAA Division I students received. If Mr. Boyd did receive the same waiver NCAA Division I students received, the NCAA would have added an extra year to his Eligibility Clock and he would have qualified for the waiver.

13.     Mr. Boyd and others in his position have a uniquely small window of time to compete in NCAA Division I basketball and receive NIL compensation for doing so. The NAIA Eligibility Limitation Bylaws and Five-Year Waiver Rule arbitrarily diminish competitive opportunity in the limited period. Because the above eligibility rules produce significant anticompetitive effects in this market, unreasonably restrain trade, and harm players like Mr. Boyd, this complaint follows.

14.     Further, and as a direct result of the NCAA's denial of a waiver pursuant to these rules, Mr. Boyd has already lost an offer to play this coming season at Vanderbilt University and the NIL opportunities a relationship with Vanderbilt would have created valued at $350,000. Currently, Mr. Boyd has received roster spot offers from several other NCAA Division I college basketball programs linked with opportunity for NIL compensation. However, the offers are

6

contingent on the restoration of his eligibility. Without relief from this Court, Mr. Boyd will lose irreplaceable opportunities for athletic development, NIL compensation, and the chance to enhance his professional prospects. These harms cannot be adequately remedied by damages alone. Thus, because the harm caused by these rules is ongoing and irreparable, preliminary injunctive relief is also necessary.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 26 of the Clayton Act, 15 U.S.C. § 15 and 26, and under 28 U.S.C. §§ 1331 and 1337.

16.     The Court also has diversity of citizenship jurisdiction under 28 U.S.C. § 1332 because Plaintiff is a resident of Tennessee and Defendant is a corporation headquartered in Indianapolis, Indiana.

17.     This Court also has jurisdiction over this action under the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101 because this Court has supplemental jurisdiction under 28 U.S.C. § 1367.

18.     This Court may exercise personal jurisdiction over Defendant NCAA because Defendant currently transacts business in the Nashville Division of the Middle District of Tennessee. Defendant and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in the Middle District of Tennessee. Defendant has also directed many of the specific acts alleged in the complaint to Plaintiff within this District.  By way of example, as a result of Defendant's conduct, including the NAIA Eligibility Limitation Bylaws, Defendant caused Mr. Boyd to lose his offer to play basketball at Vanderbilt University this season and the NIL opportunities a relationship with Vanderbilt would have guaranteed.

7

19.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391 (b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and because the NCAA transacts business and is found within this District. There are many NCAA Member Institutions located within the District, including, but not limited to, Vanderbilt University.

## THE PARTIES

20.     Plaintiff Derrin Boyd is a college basketball player and resident of Nashville, Tennessee. He competed for two years at an NAIA institution before transferring to an NCAA Division I school, where he played for two academic years, and subsequently transferred to another NCAA Division I program for the 2024-25 season. He now seeks to compete during the 2025-26 academic year while pursuing graduate education and continuing his basketball career at the height of his athletic and NIL earning potential.

21.     Mr.  Boyd has engaged in various studies in order to further his academic development. In addition to receiving his undergraduate degree from Lipscomb University, Mr. Boyd simultaneously earned his MBA while playing basketball. He then went on to begin his studies in Urban and Regional Planning. Mr. Boyd seeks to further refine his graduate education at another NCAA elite program as he values academic integrity.

22.     Mr. Boyd is a successful basketball player who has risen through the ranks to thrive at the NCAA level. Reflective of his hard work and vitality to on-court competition, he earned NIL compensation at a total of $120,000 during the 2024-24 season for the first time in his career.

23.     Defendant NCAA is an unincorporated association that acts as the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in the Middle District of Tennessee. These member institutions are organized into three divisions, and Division I includes over 350 schools.

8

24.	Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, the Bylaws at issue in this case, Division I Bylaws 12.8.1, 12.8.1.1, and 12.8.1.7. The NCAA Constitution and Bylaws were adopted by votes of the member institutions and various NCAA councils, and they may be amended by votes of the member institutions or NCAA councils. Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its member institutions and among NCAA member institutions.

25.	As a practical matter, an academic institution that wishes to participate in any meaningful way in the highest and most popular level of collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA that include reduced athletic-scholarships, suspensions, prohibition on post-season eligibility, vacating previously earned wins, monetary fines, and the so-called "death penalty."[5] The NCAA and its member institutions control the highest and most popular level of collegiate athletics. Therefore, any individual who wishes to provide athletic services in exchange for the payment of partial or full tuition for an undergraduate academic education and wishes to derive the substantial benefits from competing at the highest level of collegiate athletics must, by necessity, attend an NCAA Division I member institution.

---

[5] The "death penalty" is the NCAA's most severe punishment and refers to the complete shutdown of a specific athletic program at a member institution for at least one year. This sanction is reserved for egregious and repeated rules violations, particularly where the institution has shown a pattern of noncompliance or a lack of institutional control.

9

26.     There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA athletic schools: (i) the ability to contract athletic services in exchange for partial or full cost of an education, including room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that will best be able to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from NIL agreements, and (vii) competition at the highest level of collegiate athletics.[6]

## FACTUAL BACKGROUND

I.     **Mr. Boyd's Background and Collegiate Sporting Experience from 2019 through the 2024-2025 Season**

27.     **2019-20 Season**. Mr. Boyd began his collegiate basketball career at Georgetown College, an NAIA institution, during the 2019-20 academic year. He redshirted that season, meaning he did not participate in intercollegiate competition. By redshirting, Mr. Boyd delayed the start his five-year NCAA eligibility clock.

28.     **2020-21 Season.** Mr. Boyd returned to Georgetown College and made his collegiate debut during the 2020-21 season, thus beginning the ticking of his five year NCAA eligibility clock. He started in 22 of 24 games and helped lead the Tigers to a 16-8 record. He averaged 16.4 points, 3.9 rebounds, and earned First Team All-Mid-South Conference honors while being named Mid-South Freshman of the Year.

---

[6] As explained further below, Mr. Boyd was expected to access each of these attributes through his anticipated transfer to Vanderbilt University, an NCAA Division I institution and member of the Southeastern Conference (SEC). Vanderbilt recruited Mr. Boyd for the 2025-26 season with the intent of offering him a scholarship, access to elite training and academic resources, exposure on national broadcasts, and an NIL opportunity projected to be worth approximately $350,000.

29.     **2021-22 Season.** Mr. Boyd remained at Georgetown College for a second season of NAIA competition in year two of his arbitrarily ticking NCCA eligibility clock. He started all 33 games and led the team in scoring with 16.7 points per game, while adding 4.9 rebounds, 3.1 assists, and shooting over 48% from the field. He was named Mid-South Conference Outstanding Player of the Tournament and received NAIA All-America Honorable Mention recognition.

30.     **2022-23 Season.** Mr. Boyd transferred to Lipscomb University, an NCAA Division I institution, in the summer of 2022. This was Mr. Boyd's first official season of NCAA competition though he was automatically allowed only three years of NCAA eligibility. He played in and started all 33 games, averaging 10.5 points per game and ranking second on the team in total minutes played, field goals made, and total points.

31.     **2023-24 Season.** Mr. Boyd returned to Lipscomb and was a leading scorer among guards, averaging 17.6 points per game while shooting 52.6% from the field and 44% from three-point range—ranking among the top performers in the ASUN Conference. He was named to the All-ASUN Second Team but suffered a season-ending injury after 22 games. Despite his devastating injury, the NCAA counted this season toward Mr. Boyd's five year clock and three years of NAIA transfer eligibility, refusing to recognize it as a denied opportunity for extension or waiver purposes.

32.     **2024-25 Season.** Mr. Boyd transferred as a graduate student to the College of Charleston, an NCAA Division I institution, where he played only his third season of NCAA competition. He started all 31 games, averaging 13.7 points, earned All-CAA Third Team honors, and led the team in scoring multiple times, including a season-high 26-point performance against Hampton. Mr. Boyd's leadership and productivity made him a central figure in the Cougars' offensive strategy. As a result of the limitations imposed by the NAIA Eligibility Limitation

11

Bylaws and the NCCA's arbitrary and inconsistent enactment of the Five-Year Rule Waiver, Mr. Boyd's eligibility prematurely expired.

33. **2025-26 Season and Denial of NCAA Waiver.** In Spring 2025, Mr. Boyd was recruited by Vanderbilt University, a member of the Southeastern Conference (SEC), to join its basketball program for the 2025-26 season. Mr. Boyd's anticipated NIL valuation was approximately $350,000. However, due to uncertainty surrounding his eligibility due to the NCAA NAIA Eligibility Limitation Bylaws, Vanderbilt has since filled his roster spot, and Mr. Boyd has lost the opportunity to realize that compensation from Vanderbilt. Mr. Boyd currently holds several 2025-26 roster spot offers from other Division I programs, which include opportunities for NIL compensation and are contingent on his eligibility being restored. Without intervention, he risks losing these offers and NIL opportunities, effectively excluding him from the competitive college basketball market at the height of his value and athletic potential.

34. On April 16, 2025, the NCAA denied the waiver request submitted at Mr. Boyd's request and on his behalf by the College of Charleston.[7] The NCAA concluded that Mr. Boyd had not met the NCAA's self-defined requirement of demonstrating two denied participation opportunities beyond his or the institution's control, which is required for an extension of eligibility under the Five-Year Rule Waiver. Although the NCAA recognized Mr. Boyd's 2019-20 redshirt year as one potential denied season, it found that Mr. Boyd had already used four seasons of competition—2021-22 (played at a non-NCAA institution), 2022-23, 2023-24, and 2024-25—and was therefore ineligible for an extension.

---

[7] Ex. 1, NCAA Decision on Request for Extension of Eligibility Waiver by the College of Charleston on April 16, 2025.

35.     Further, and importantly, the NCAA determined that Mr. Boyd did not qualify under the December 23, 2024 blanket waiver issued by the Division I Board of Directors following the court's *Pavia* decision, which was designed to extend eligibility for athletes who had competed at non-NCAA institutions, because his arbitrary five year eligibility period had already expired and the NCAA decided he did not demonstrate any extraordinary circumstances warranting further relief. Accordingly, the NCAA denied the waiver and barred Mr. Boyd from competing in the 2025-26 season.

36.     While playing at the NAIA institution Georgetown College, time counted towards his NCAA Eligibility Clock, but Mr. Boyd received no NIL compensation. During his most recent season at the College of Charleston, for the first time in his collegiate career, Mr. Boyd earned NIL compensation at a total of $120,000 as a result of his hard work and competitive development. Due to Defendant's arbitrary restrictions, he has lost the opportunity to earn $350,000 with Vanderbilt University. Mr. Boyd is still currently projected to receive nearly three times this NIL compensation in the forthcoming 2025-26 season, which will be barred by NCAA NAIA Eligibility Limitation Bylaws absent the relief requested in this complaint.

## II.     Four Year Colleges Are Governed by the NCAA

37.     The NCAA "is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of student-athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity and inclusion."[8] The NCAA, previously known as the Intercollegiate Athletic Association (IAA), was founded in 1905 to regulate college basketball. Today, the NCAA and its members collectively

---

[8]  NCAA Constitution, December 14, 2021, at 1
(https://ncaaorg.s3.amazonaws.com/governance/ncaa/constitution/NCAAGov_Constitution121421.pdf).

issue rules that govern many athletic competitions among NCAA member schools. The NCAA is comprised of three divisions. Of the NCAA's 1,100 schools, approximately 350 schools compete in Division I. Division I itself is divided, for the purposes of basketball competition, into informal subdivisions, such as power conferences, mid-major conferences, and low-major conferences. Power conferences are the highest regarded and offer the highest tier of competition and highest opportunity to earn NIL compensation. Among these tiers are 32 conferences in Division I. Conferences may enact and enforce conference-specific rules, but these must be consistent with the NCAA's own rules. The NCAA rules governing participation in Division I generally are enacted by the Division I Board of Directors.

38.     But while the NCAA started out as a small nonprofit organization, its economic power has grown exponentially over the last 120 years. Today, the NCAA generates approximately $1 billion in annual revenue each year from "March Madness," their Division I men's and women's basketball tournaments. The FBS conferences have a multi-year media contract with ESPN for the College Basketball Playoff, the total value of which is $5.64 billion. The NCAA's current men's media rights agreement, as extended in 2016, is valued at almost $9 billion.[9] The four conferences with the largest revenues, known as the Power Four Conferences, each generate hundreds of millions of dollars in revenues per year, in addition to the money that the NCAA distributes to them. For example, the SEC—one of the Power Four Conferences—recently signed a media rights deal providing an estimated $710 million in annual revenue.[10] The revenues of the Power Four

---

[9] John Ourand & Michael Smith, *CBS, Turner Extend NCAA Tourney Rights, With Fee Up Markedly*, SPORTS BUSINESS JOURNAL (Apr. 11, 2016), https://www.sportsbusinessjournal.com/Daily/Closing-Bell/2016/04/12/NCAA/.

[10] Michael Johnson, *Power conferences dominate NCAA media landscape*, S&P GLOBAL (Dec. 02, 2024), https://www.spglobal.com/market-intelligence/en/news-insights/research/power-conferences-dominate-ncaa-media-landscape.

have increased over time and are projected to continue to increase. This allows the schools within each conference to offer prospective athletes more NIL compensation. In the NCAA transfer portal, elite men's basketball players can receive up to $3 million dollars in NIL compensation, rivaling the salaries of top-tier professional athletes.[11]

39.     It's the NCAA's mission to "provide student-athletes with the opportunity to **participate in sports and compete as a vital, co-curricular part of their educational experience**....the basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an **integral part of the education program** and the student-athlete as an integral part of the student body." 2024-25 NCAA Manual (emphasis added). In other words, the NCAA concedes that the ability to participate in college sports is both "vital" and "integral" to the college experience.

## III.     Small Four-Year Colleges are Governed by the NAIA

40.     The NAIA is a governing body of small athletics programs that have no affiliation with the NCAA. As a "character-driven" organization, the NAIA prides itself on being the first collegiate athletics association to invite historically black institutions into membership and "the first to sponsor both men's and women's national championships".[12] In terms of athletic competition, however, NAIA programs are comparable to Division III NCAA programs and most

---

[11] Ben Sherman, *'Salaries' have skyrocketed for college basketball players in transfer portal: Players are commanding as much as $3 million*, SPORTS ILLUSTRATED: ARIZONA WILDCATS (Apr. 2, 2025), https://www.si.com/college/arizona/basketball/salaries-have-skyrocketed-for-college-basketball-players-in-transfer-portal-01jqvs48yqtb.

[12] *About Us*, NAIA (last visited June 23, 2025), https://www.naia.org/about/about-us.

two-year colleges ("Junior Colleges"), which are governed by the National Junior College Athletic Association ("NJCAA").[13]

41.    NAIA athletic programs receive significantly less funding than their NCAA counterparts. For example, one NCAA member school—the University of Kansas—reported $215 million in revenue across all sports during the 2023 season.[14] Even the combined the total revenue from the ten highest-earning NAIA athletic programs would not surpass $215 million.[15] In contrast, if you compiled the total revenue from the five highest-earning NCAA athletic programs, their value would be greater than the sum of every NAIA athletic program combined.

42.    This disparity in institutional funding has direct and profound effects on the opportunities available to student-athletes. NCAA member schools can offer superior training facilities, medical care, travel accommodations, academic support, media exposure, and NIL opportunities. These advantages not only enhance player development but also dramatically increase the likelihood of athletes gaining visibility with professional scouts and sponsors. In contrast, NAIA institutions often lack the resources to provide even baseline support in these areas, creating a systemic disadvantage for athletes who begin their careers outside the NCAA. As a result, student-athletes at NAIA programs face steeper paths to advancement and are routinely overlooked by both professional organizations and NIL sponsors regardless of their actual talent or performance. This

---

[13] *NAIA vs NCAA: What's the Difference?*, NEXT COLLEGE STUDENT ATHLETE (NCSA) (last visited June 23, 2025), https://www.ncsasports.org/recruiting/how-to-get-recruited/college-divisions/naia-vs-ncaa.

[14] *NCAA Division I-FBS, 2023, Revenues – All Sports and Men's, Women's and Coed Teams*, EQUITY IN ATHLETICS DATA ANALYSIS, U.S. DEP'T EDUC., https://ope.ed.gov/athletics/#/customdata/datafiltered (last visited June 26, 2025).

[15] *Id.*

imbalance reinforces a two-tiered system in collegiate athletics—one in which access to long-term opportunity is dictated not by merit, but by institutional affiliation.

43. Further, student-athletes competing at NAIA institutions are systematically limited in their ability to earn compensation and pursue professional opportunities, especially when compared to their counterparts at NCAA institutions. These structural disparities are evident across nearly all major sports. In 2023, across the National Football League ("NFL"), alumni from NCAA Power Four programs collectively held contracts worth approximately $5.9 billion in average salary. In contrast, only one NAIA alumnus—Brandon Dillon—was under contract during the 2023 NFL season, earning him a career-high contract worth $870,000.[16] More than 100 players at his position earned more valuable contracts than Dillon that season, and every one of them attended an NCAA institution.[17] Dillon's 2023 compensation, while the highest among active NAIA graduates, would not rank among the top fifty NIL-earning NCAA student-athletes. Entering the 2024 NFL season, the total average salary among NCAA alumni is projected to exceed $9 billion, while Dillon remains unsigned.

44. For men's basketball players, the disparity is even more severe. Currently, not a single NAIA alumnus appeared on a National Basketball Association ("NBA") roster.[18] Since the introduction of NIL compensation, no NAIA graduate has been selected directly into the NBA. The

---

[16] *NAIA player salaries in the 2023 NFL season*, TOPDAN (Sep. 1, 2023), https://topdan.com/nfl-salaries-by-college/2023/naia.html (citing *NBA Colleges: Ranking colleges/universities by active NBA players & earnings*, SPOTRAC, https://www.spotrac.com/nba/colleges); *Brandon Dillon: Contract Details*, SPOTRAC (last visited June 26, 2025), https://www.spotrac.com/nfl/player/_/id/29359/brandon-dillon.

[17] *2023 Tight End Contract Value Rankings: Listing the top salaries, cap hits, cash, earnings, contracts, and bonuses, for all active 2023 Tight End players*, SPOTRAC (last visited June 26, 2025), https://www.spotrac.com/nfl/rankings/player/_/year/2023/position/te/sort/contract_value.

[18] C.f. *NBA Colleges: Ranking colleges/universities by active NBA players & earnings*, SPOTRAC (last visited June 26, 2025), https://www.spotrac.com/nba/colleges.

17

path to professional basketball for NAIA players effectively requires transferring to an NCAA Division I institution to compete and establish market value. Consider the example of Riley Minix, a standout NAIA athlete who set twenty-nine school records and was named Sun Conference Player of the Year in consecutive seasons.[19] Despite his accolades, Minix transferred to Morehead State under the NCAA's Medical Hardship exception for a final year of eligibility, knowing that he would need to compete against NCAA-level talent to be considered by the NBA. During that same five-year period, the average NCAA men's basketball player would have earned approximately $280,000 in NIL compensation.[20] After one season at Morehead State, Minix signed a one-year, $578,000 contract as an undrafted free agent, splitting time between the San Antonio Spurs and their G League affiliate.[21] In contrast, another player, Kel'El Ware, spent his entire two-year college career at NCAA institutions.[22] Both Ware and Minix played at NCAA institutions in 2023; Minix was a more statistically productive athlete than Ware, and Minix was on a more talented team.[23] Still, because Ware had an extra season of NCAA exposure, he was drafted in the first round and signed

---

[19] Matt Guzman, *NAIA to NBA: After 2-Way Deal, Spurs' Riley Minix Has 'Nothing Left to Prove'*, SPORTS ILLUSTRATED: SAN ANTONIO SPURS (Jan. 15, 2025), https://www.si.com/nba/spurs/news/naia-nba-2-way-deal-san-antonio-spurs-riley-minix-nothing-left-to-prove.

[20] *Data Dashboard*, NCAA (last visited June 23, 2025), https://nilassist.ncaa.org/data-dashboard/ (the average total athlete earnings for an NCAA men's basketball player from Jan. 1, 2024 – Oct. 13, 2024 is $55,817—or $279,085 over the course of five years).

[21] *Spurs Sign Riley Minix To Two-Way Contract*, NBA G LEAGUE (Oct. 19, 2024), https://gleague.nba.com/news/spurs-sign-riley-minix-to-two-way-contract.

[22] *Kel'el Ware*, SPORTS REFERENCE: COLLEGE BASKETBALL (last visited June 23, 2025), https://www.sports-reference.com/cbb/players/kelel-ware-1.html (Ware played 2022-23 with Oregon and 2023-2024 with Indiana).

[23] During the 2023-24 NCAA season, Minix averaged 5 more points, 0.7 more assists, and only 0.2 rebounds less than Ware on a per-game basis. Minix led Morehead State to March Madness for the fourth time in forty years; Ware's Indiana University was ineligible to compete.

to a four-year, $20 million deal with the Miami Heat.[24] Minix, arguably the most accomplished men's basketball player in Southeastern University's history, remains undrafted heading into the 2025 season.

## IV.  The NCAA Is Governed by Self-Created Bylaws That Discriminate Against NAIA Athletes

45.     Each NCAA division maintains its own bylaws, with amendments proposed by member institutions.[25] NCAA member institutions enter into a formal agreement with the NCAA by voluntarily adopting its bylaws committing to uphold and enforce its rules and regulations as a condition of membership. Each NCAA member school is required to "hold itself accountable to support and comply with the rules and principles approved by the membership."[26] Several of the bylaws applicable to Division I schools are at issue in this lawsuit.

### A.  The Five-Year Rule and Eligibility Clock: NCAA Bylaw 12.8.1 and 12.8.1.1

46.     Under NCAA Bylaw 12.8.1, student-athletes must complete their seasons of participation within five calendar years (the "Five-Year Rule"). Further specified under NCAA Bylaw 12.8.1.1, the five-year window, known as the "Eligibility Clock," starts to run from the date on which athletes register in a regular term of an academic year as a full-time students at any "collegiate institution" and attend the first day of classes for that term whether or not such institution is a member of the NCAA and whether or not the athletes compete in any sport at the non-NCAA institution.

---

[24] Anthony Chiang, *Heat signs first-round pick Kel'el Ware, brings back familiar face Dru Smith on two-way deal,* MIAMI HERALD (July 2, 2024), https://www.miamiherald.com/sports/nba/miami-heat/article289672039.html.

[25] NCAA Constitution (December 14, 2021), https://ncaaorg.s3.amazonaws.com/governance/ncaa/constitution/NCAAGov_Constitution12142 1.pdf.

[26] *Id.* at 17.

47.     The NCAA's Guide for Four Year Transfers has a section on the Eligibility Clock where it explains that the purpose of the Five Year Rule is to "move student-athletes toward graduation in a timely manner."[27] In other words, the NCAA concedes that the start of the Eligibility Clock is linked to academic goals and the Five-Year Rule is not designed for any procompetitive purpose that couldn't be achieved through less restrictive means. Additionally, this stated purpose that a timely manner is connected to a five year period directly contradicts the NCAA's own celebrated average graduate rate of six-years.

48.     The irrelevance of the Eligibility Clock start date to competitive balance becomes even more apparent when one realizes that the five-year clock begins to run whether a student plays a sport or not. Under the bylaws, a student can attend a NAIA institution for one semester without playing any sports, obtain some credits to be put towards a bachelor's degree, transfer to a NCAA school, and the student still only has eligibility to play three seasons of basketball and earn NIL compensation.

49.     In contrast, a student who graduates from high school, plays basketball at a preparatory school for a post-grad year, and then attends an NCAA institution still receives five years of eligibility to play four seasons. Similarly, a student who graduates high school and becomes a professional athlete in another sport can play that other sport for years, then go to an NCAA institution and still have five years of eligibility to play four seasons of a sport so long as it is a different sport than the sport they played professionally. The NCAA rules do not limit the ability of a former professional athlete to profit from NIL compensation while playing Division I basketball even though they have had a chance to physically mature well beyond a typical 18-year-old college

---

[27] 2024-25 NCAA Guide for Four Year Transfers
(http://fs.ncaa.org.s3.amazonaws.com/Docs/eligibility_center/Transfer/FourYearGuide.pdf) at 13.

freshman. For instance, Chris Weinke entered Florida State University as a freshman following a six-year professional baseball career and ended up winning the Heisman Trophy, awarded annually to the most outstanding player in college football, at 28 years of age.[28] Accordingly, it is apparent that the Five-Year Rule does not exist for reasons of maintaining amateurism and competitive balance or else it would preclude these experienced athletes from competing in Division I NCAA sports.

**B.     Extension of Eligibility Rule – NCAA Bylaw 12.8.1.7**

50.     Under NCAA Bylaw 12.8.1.7, "[t]he Committee on Student-Athlete Reinstatement, or its designated committee, by a two-thirds majority of its members present and voting, may approve waivers of the five year rule as it deems appropriate."

51.     Further under NCAA Bylaw 12.8.1.7(b), waiver may be granted if "[t]he student-athlete is deprived of the opportunity to participate for more than one season in his or her sport within the five year period of eligibility for reasons that are beyond the control of the student-athlete or the institution."

52.     The Five-Year Rule Waiver's enumerated circumstances considered to be beyond the student athlete's control are arbitrary, inflexible, and unduly limited. They include circumstances such as incapacitating physical or mental injury suffered by the student athlete or their family member, reliance on "erroneous academic advice" from authorities leading to ineligibility to participate in college sports, natural disasters, and extreme financial difficulties. *See* NCAA Bylaw 12.8.1.7.1.1 – Circumstances Beyond Control.

53.     The arbitrary application of the NCAA's extension rule is particularly stark in college basketball, where athletes frequently transfer, redshirt, or recover from injury. Consider the

---

[28] *Chris Weinke – 2000*, HEISMAN: HEISMAN TROPHY WINNERS (last visited June 26, 2025), https://www.heisman.com/heisman-winners/chris-weinke/.

case of players who took advantage of the NCAA's COVID-19 blanket waiver and were granted a full additional year of eligibility, regardless of whether they played a full season. In contrast, student-athletes like Mr. Boyd—who redshirted in 2019, faced the COVID-19 pandemic in 2020, and suffered a recent, legitimate season-ending injury in 2024—are excluded from relief simply because their circumstances do not fit neatly into the NCAA's arbitrary checklist. Meanwhile, older players with minimal NCAA contribution have been allowed to return for sixth or even seventh years, while Mr. Boyd, a three-time all-conference performer recruited by a Power Four program, is categorically barred from finishing his career. This inconsistency underscores the lack of any principled or competitively necessary basis for denying eligibility waivers to athletes with legitimate grounds for extension—particularly in a sport like basketball, where NIL value and professional prospects are tightly linked to final-year exposure.

### C. The Application of the NAIA Eligibility Limitation Bylaws to Plaintiff Derrin Boyd

54. The NCAA's application of its NAIA Eligibility Limitation Bylaws to Mr. Boyd, a transfer player who began his career at an NAIA institution, unlawfully restrains trade in the market for NCAA Division I Men's basketball players in violation of Section 1 of the Sherman Act.

55. Mr. Boyd is currently continuing his pursuit of a graduate-level education. Because of this desire to complete advanced coursework and further his academic development, he has a longer period of residency at collegiate institutions. Mr. Boyd chose to continue his education and pursue graduate coursework due to the high caliber of programs offered at NCAA institutions compared to his coursework at his NAIA institution. In the course of the NCAA's celebrated six-year period, Mr. Boyd will have completed his undergraduate degree, graduate degree in a Master of Business Administration, and begin his graduate studies in Urban and Regional Planning. However, only four of these years will be at NCAA institutions. The NCAA's proud

acknowledgment that competing in sports is core to student-athletes' educational experience demonstrates its own five-year period unreasonably restrains transfer students from this vital component to their education. The NCAA's five-year period cuts off the ability of student-athletes, like Mr. Boyd, to pursue the challenging yet rewarding opportunity to compete on-court and in the classroom for the same period awarded to their non-transfer counterparts.

56.     Mr. Boyd's NCAA Eligibility Clock was prematurely started during his first year at Georgetown College, a non-NCAA institution. In application, this rule treats Mr. Boyd's opportunity to develop his skills, build his reputation, strengthen his exposure, and earn NIL compensation at an NAIA institution as equal to the opportunities at a NCAA member institution. This is not the case. Ultimately, this rule prevents Mr. Boyd from capitalizing on his full value and marketability during a full experience in NCAA Division I competition, the same experience awarded to his counterparts who attended four consecutive years at NCAA member institutions, by precluding his eligibility on arbitrary procedural grounds tied to his prior enrollment at a non-NCAA institution. Had his Eligibility Clock began at the time he started at an NCAA institution, Mr. Boyd would participate in his fourth season during the 2025-26 year at the NCAA level—the same length of residency as his non-transfer counterparts.

57.     As a result, Mr. Boyd was inequitably awarded only three seasons of NCAA eligibility compared to his counterparts who attended an NCAA institution for the typical four consecutive years. This artificial cap on his eligibility is an automatic limitation that arbitrarily is imposed against his ability to compete at the NCAA level for a full experience and have the full opportunity to earn NIL compensation and increase his future earning potential. These bylaws operate collectively to reduce the number of years that Mr. Boyd, an NAIA transfer, may participate in the Division I NIL market while allowing athletes who begin and remain in the NCAA system to play for longer and profit accordingly.

23

### D. The Application of the Five-Year Rule Waiver to Plaintiff Derrin Boyd

58. Even if the Eligibility Clock is deemed appropriate, the NCAA's arbitrary and inconsistent application of its Five-Year Rule Waiver to Mr. Boyd unlawfully restrains trade in the market for NCAA Division I Men's basketball players in violation of Section 1 of the Sherman Act.

59. The NCAA utilized the Five-Year Rule Waiver in order to create an eligibility extension due to the disruption caused by the COVID-19 pandemic. Mr. Boyd was not awarded the same exemption of the NCAA's COVID era eligibility extension during his 2020-21 season compared to his Division I counterparts. While Division I athletes received additional years of eligibility irrespective of their actual participation during the pandemic, those who competed at NAIA schools during the same period—such as Mr. Boyd—were excluded from equivalent relief. As a result, NCAA institutions have been permitted to field athletes with six or even seven years of eligibility while athletes like Mr. Boyd are foreclosed from a fourth season of NCAA Division I play due to procedural technicalities unrelated to competitive merit or fairness.

60. Mr. Boyd's attempt to obtain a waiver under the Five-Year Rule Waiver was denied based on narrow and inflexible criteria that fails to account for the full context of his academic and athletic career. Although Mr. Boyd was injured during his 2019-20 season, suffered a season-ending injury during his 2023-24 season, and received COVID relief for one non-NCAA season (rather than a NCAA season as his counterparts did), the NCAA refused to recognize at least two seasons as "denied" under the bylaw, disqualifying him from further participation in the NCAA. This rigid interpretation arbitrarily excludes a deserving athlete from competition and forecloses Mr. Boyd's meaningful access to NIL earnings during his most marketable year.

24

61. The inconsistent and arbitrary nature of the Five-Year Waiver Rule has misguided Mr. Boyd's ability to best utilize the duration of his eligibility. Had there been more consistent application or concrete guidance about when the bylaw applies to specific circumstances, including if there are any different applications for transfer students, Mr. Boyd would have been better able to understand how to handle the many extenuating circumstances he has encountered in his career. Additionally, had Mr. Boyd known the COVID era exception would not apply equally to him as his non-transfer counterparts, he would not have detrimentally relied on the NCCA's Five-Year Rule Waiver in accepting a roster spot with Vanderbilt University and standing to earn significant NIL compensation.

62. Absent enforcement of these eligibility limitations, there is and would have been more substantial demand among high-major NCAA Division I programs for Mr. Boyd to fill a roster spot for the 2025–26 season. Indeed, Mr. Boyd was actively recruited by Vanderbilt University and stood to earn significant NIL compensation. Even now that Vanderbilt was forced to fill Mr. Boyd's promised roster spot due to Defendant's arbitrary restrictions, active recruitment efforts by other competitive NCAA member institutions enthusiastically remain. The NCAA's eligibility restrictions have directly suppressed Mr. Boyd's opportunity and continues to do so, causing ongoing competitive and economic injury.

## V. The "Rule of Restitution": NCAA Bylaw 12.11.4.2

63. If the Court grants Mr. Boyd injunctive relief, it must also address NCAA Bylaw 12.11.4.2, commonly known as the "Rule of Restitution," which provides:

> If a student-athlete who is ineligible under the terms of the bylaws or other legislation is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following

25

actions against such institution in the interest of restitution and fairness to competing institutions...

NCAA Bylaw 12.11.4.2. Potential punishments under the Rule of Restitution include vacating wins, postseason bans, return of television revenue, and financial penalties, among others. *Id*. To make a temporary restraining order and preliminary injunction meaningful in this case, Mr. Boyd respectfully requests that the Court enjoin the NCAA's application of the Rule of Restitution against Mr. Boyd or any other NCAA Division I college to which Mr. Boyd could transfer because its "purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor." *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 601 (N.D.W. Va. 2012).

## RELEVANT MARKETS

64.     The relevant market is the labor market for college basketball athletes, specifically those competing at the NCAA Division I level.[29] Within this market, college athletes compete to earn roster spots on NCAA Division I teams while NCAA member institutions compete among themselves to recruit and retain top-tier athletic talent in the NCAA's second-highest grossing sport. To attract these athletes, including potential transfer students from NAIA institutions, NCAA member institutions offer benefits such as scholarships, elite academics, premier facilities, and expert coaching.

65.     The relevant geographic market is the United States. The NCAA and its member institutions are situated throughout the country and participate in nationwide intercollegiate athletic

---

[29] *See Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024) (holding the relevant market affected was "the labor market for college football athletes in general and NCAA Division I football specifically").

competition, including the coordination and broadcasting of such events. The restraints at issue affect a national market as member institutions recruit and compete for talent across state lines. Accordingly, the relevant labor market extends throughout the United States.

66.     There are no practical alternatives to the relevant market for college basketball athletes, specifically transfer students from NAIA institutions. The unique aspect of the relevant market is characterized by opportunity to showcase athletic talent at the highest level of intercollegiate basketball while studying in nationally ranked degree programs. Student-athletes at NCAA institutions often have access to more elite educational opportunities than those at NAIA schools, including broader academic resources, renowned faculty, and advanced research facilities. Further, participation in March Madness is an exclusive opportunity available only to NCAA athletes providing them with national exposure, high-level competition, and a potential springboard to professional athletic careers. Finally, NIL opportunities are effectively limited to student-athletes at NCAA member institutions as approximately 99% of NIL compensation is directed towards those athletes rather than athletes at non-NCAA institutions, such as those in the NAIA.[30]

67.     Within the relevant market, the NCAA and its member institutions exercise exclusive market power by possessing the sole authority to establish the rules and regulations governing participation in Division I athletics—and thereby, controlling access to the market itself.

68.     The transactions between the NCAA, its member institutions, and college athletes are commercial in nature as they impact the future earning potential of student-athletes and generate substantial revenue for member institutions and NCAA conferences. Student-athletes receive scholarships, access to training, and exposure opportunities critical to their professional development in exchange for their athletic services. The NCAA and its member institutions derive

---

[30] *See, supra*, Section III.

substantial financial returns from the commercialization of athletic events—particularly men's basketball—through revenue streams such as ticket sales, merchandise, and broadcast rights. Accordingly, the transactions between the NCAA, its member institutions, and college athletes are inherently commercial in nature and fall within the purview of the Sherman Act.

**ANTICOMPETITIVE EFFECTS**

69.     Plaintiff alleges that the NCAA's NAIA Eligibility Limitation Bylaws and the Five-Year Rule Waiver violate Section 1 of the Sherman Antitrust Act of 1890 which provides that "[e]very contract, combination…, or conspiracy, in restraint of trade or commerce among the several States…is declared to be illegal." 15 U.S.C. § 1. To succeed under Section 1 of the Sherman Act, Plaintiff must show that the NCAA "participated in an agreement that unreasonably restrain[s] trade in the relevant market." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003). A rule of reason analysis under Section 1 of the Sherman Act involves three steps: first, the Plaintiff must show the restraint has substantial anticompetitive effects; second, the burden shifts to the Defendant to provide procompetitive justifications; and third, the burden shifts back to the Plaintiff to demonstrate less restrictive alternatives exist if Defendant's procompetitive justifications are valid.

70.     The NCAA enacts and enforces rules that it claims promote the well-being of college athletes and preserve the amateurism aspect and competitive balance of Division I college sports.

71.     The NCAA and its member institutions, including member institutions in Tennessee, adopt these rules through the member institutions and the Division I Council, making these rules equivalent to horizontal agreements among the NCAA and its member institutions who compete against one another for the labor of Division I college basketball players. Member institutions have no practical choice but to agree to and adopt the rules as the NCAA governs the

28

only meaningful league structure in college athletics, making it the sole gateway to accessing the national market for high-level competition, exposure, and revenue.

72. Despite what the NCAA may claim, the NAIA Eligibility Limitation Bylaws and the Five-Year Rule Waiver restrain college athletes from improving their economic opportunity, personal growth, and well-being with NIL opportunities, through a full college playing experience, a freedom afforded to all athletes who enroll at NCAA Division I members as freshman, but not to NAIA transfers or players whose career was disrupted due to reasons beyond their control. These restrictions violate the Sherman Act because they have direct anticompetitive effects that harm college basketball players and consumers of college basketball.

## VI. The NAIA Eligibility Limitation Bylaws and Five-Year Rule Waiver's Effects on College Basketball Players

73. In essence, the NAIA Eligibility Limitation Bylaws are no more than an agreement to limit the amount of time athletes may play NCAA Division I basketball because they lack the financial resources to attend NCAA colleges or have chosen to attend a non-NCAA institution prior to transferring to a NCAA Division I college. These same restrictions are not placed on athletes who choose to delay entry to a NCAA Division I college to attend prep school, serve in the military, or even compete professionally in another sport. Additionally, the Five-Year Rule Waiver unfairly penalizes student-athletes whose careers are disrupted by circumstances beyond their control while failing to provide sufficient accommodations to account for the full extent of those disruptions and their lasting impact.

74. The NAIA Eligibility Limitation Bylaws harm NAIA college and former NAIA college basketball players in the following main areas of the relevant markets: when an athlete is deciding whether to attend a NAIA college after high school graduation; when an athlete is deciding whether to attend a NAIA college for a second year or transfer to an NCAA Division I College;

29

when an athlete has transferred from a NAIA college to a NCAA Division I College and has his eligibility limited to a maximum of three years; and when NAIA transfer students' NCAA eligibility is further cut off for reasons beyond their control.

75.    The NAIA Eligibility Limitation Bylaws harm athletes when they are deciding what to do after graduating from high school. Upon graduating from high school, athletes can choose between several options including, but not limited to, attending a Division I NCAA institution, attending a NAIA college, going to preparatory school, joining the military, playing a professional sport, or taking a gap year or non-sport job. All options provide the possibility of athletes then going on to compete for four plus years at an NCAA Division I institution except one: going to a NAIA college.

76.    Because the NCAA counts every year attended at an NAIA institution against athletes' seasons of allowed competition at NCAA Division I institutions, the NAIA Eligibility Limitation Bylaws harm each athlete after their first day at an NAIA institution. This restriction hinders athletes' ability to participate in the market for the full experience when they go onto the next level of NCAA Division I college basketball.

77.    The NAIA Eligibility Limitation Bylaws harm athletes after they transfer from NAIA to an NCAA Division I institution by limiting their years of competition.  Economically, the reduction in playing time for former NAIA college players represents a reduction in NIL earnings. For some players, like Boyd, that can be a $350,000 plus reduction per year. Additionally, each year of competition at the NCAA Division I level offers athletes unmatched training, development, and exposure which are critical factors in attracting the attention of professional teams and leagues. By restricting eligibility, the NCAA potentially limits athletes' ability to showcase their talent at the highest collegiate level diminishing their future earning potential and career opportunities in professional sports. Finally, the NCAA frequently touts the benefits of competing in college

30

athletics for college athletes, especially for college athletes who will not move on to professional athletics.[31]

78.     Additionally, the Five-Year Rule Waiver specifically imposes an arbitrary restriction on athlete eligibility by cutting off access based on a rigid rule rather than individual circumstances or market dynamics. This blanket standard unfairly disqualifies otherwise eligible athletes—many of whom lost valuable time due to circumstances beyond their control, such as injury or COVID-related disruptions—from continuing their careers despite their athletic ability or academic standing. Additionally, its inconsistent application, as shown by the disparate applicability of the COVID era exception between students' whose Eligibility Clock is running at NCAA institutions and those at non-NCAA institutions, restrains players ability to best utilize their eligibility. As a result, the rule artificially limits the pool of high-performing athletes, suppresses opportunities for NIL compensation at the peak of student-athletes' market value, and distorts competitive equity across programs. Even when member institutions are ready to offer roster spots and meaningful NIL deals, the bylaw acts as a categorical barrier disregarding merit, progress, and demand in favor of a blanket disqualification. As a result, student-athletes are unfairly penalized with no meaningful way to address the full extent of the harm caused by career disruptions, including, in some cases,

---

[31] *See, e.g.*, The Value of College Sports, NCAA, https://www.ncaa.org/sports/2014/1/3/the-value-of-college-sports.aspx (accessed Jun. 26, 2025) (the value of college sports includes unparalleled exposure and experiences through "the opportunity to travel across the country and around the world for regular-season contests, NCAA championships and foreign tours" which "can open doors for the few who will compete professionally and for the majority who will go pro in something other than sports.").

interruptions to their NIL compensation, and the long-term impact on their ability to compete and maximize their earning potential.

79.     The NAIA Bylaw Limitations deny these benefits to former NAIA college athletes. The lost opportunity that comes with missing college athletics for even one season is significant as the lost time and economic opportunity cannot be easily remedied. For athletes in the market to provide athletic services in Division I basketball, the impact of a missed season is even more pronounced in its effect on the athletes' future earning potential. Each game missed is a lost opportunity to showcase a college athlete's elite skills in front of national audiences and professional scouts. Each season of missed competition causes immeasurable and irreparable harm to college athletes like Mr. Boyd.

80.     Further, the Five-Year Rule Waiver inflicts direct and immediate harm on athletes like Mr. Boyd by denying access to current opportunities for exposure, skill development, and NIL compensation. In particular, Mr. Boyd was prevented from playing on a top, competitive team and signing a $350,000 NIL agreement with Vanderbilt. This tangible financial loss not only underscores the severity of the restriction but also compounds the long-term damage to his future earning potential that cannot be easily remedied or reversed. Additionally, Mr. Boyd faces immediate harm as he stands to further lose out on his other Division I offers without the immediate restoration of his eligibility.

## VII.    The NAIA Eligibility Limitation Bylaws and the Five-Year Rule Waiver's Effects on Consumers

81.     The NCAA Eligibility Limitation Bylaws also create harmful downstream effects for nationwide consumers who attend college basketball games or watch them on television. When athletes are barred from competing solely because they previously attended an NAIA institution or faced circumstances beyond their control, the overall quality of the NCAA product declines. Teams

32

may be less competitive without the ability to retain skilled transfer players for an additional season, fans miss out on the opportunity to watch talented athletes represent their favorite programs, and the appeal of NCAA basketball as an entertainment product is weakened, ultimately diminishing its value to the public. With Mr. Boyd on its 2025-26 roster, Vanderbilt would have featured a seasoned, dynamic scoring guard who averaged nearly 14 points per game at College of Charleston and previously led Lipscomb in scoring at 17.6 points per game. Mr. Boyd's experience, efficiency, and perimeter scoring ability make him a valuable addition in the backcourt, particularly for a Vanderbilt program seeking to rise in a competitive SEC landscape. Losing Mr. Boyd after the 2024-25 season deprives Vanderbilt of a key contributor capable of driving offensive production and on-court leadership. That loss will leave Vanderbilt less competitive in the SEC next year, making its games less compelling to watch—not only for Vanderbilt fans, but for all consumers of high-level college basketball. Likewise, other NCAA programs will be disadvantaged if they cannot retain similarly skilled transfer athletes due to arbitrary eligibility cutoffs.

82.     The Five-Year Rule Waiver specifically diminishes the overall value of college basketball by prematurely sidelining experienced, high-performing athletes at the peak of their careers—just when they are most compelling to consumers. These players often serve as the faces of their programs, driving ticket sales, viewership, and engagement with the sport. When arbitrary eligibility cutoffs prevent athletes from continuing to compete, fans are denied the opportunity to watch familiar, elite talent perform at the highest level. This disrupts team continuity, weakens on-court competition, and erodes the emotional connection that fans build with athletes over time. In turn, the product offered to consumers becomes less dynamic, less recognizable, and ultimately less valuable undermining the sport's appeal and the NCAA's broader mission to promote college athletics.

83. The quality of Vanderbilt's athletic product has already suffered tangible harm, as Mr. Boyd's promised roster spot was filled, depriving the team of a high-caliber guard who would have significantly enhanced its competitive performance. This loss reduces the overall value of Vanderbilt's events for consumers by weakening the quality and appeal of the product while also limiting the ability of NCAA member institutions in Tennessee to generate revenue from fan engagement, media rights, and other related commerce.

## LACK OF PROCOMPETITIVE JUSTIFICATION

### VIII. There is No Procompetitive Justification for the NAIA Eligibility Limitation Bylaws or the Five-Year Rule Waiver

84. Because the foregoing establishes the anticompetitive effects of the NAIA Eligibility Limitation Bylaws and the Five-Year Rule Waiver on both the labor market for Division I basketball players, like Mr. Boyd, and the consumer market for individuals attending or watching college basketball events, the burden shifts to the NCAA to demonstrate procompetitive justification for the NAIA Eligibility Limitation Bylaws and the Five-Year Rule Waiver.

85. The NCAA is likely to offer three potential justifications for the NAIA Eligibility Limitation Bylaws and the Five-Year Rule Waiver: (1) promoting the academic well-being of college athletes; (2) preserving the NCAA's amateurism model; and (3) maintaining competitive balance among student-athletes, the NCAA, and member institutions.

86. The NCAA promotes its Eligibility Clock standards foster the academic development of college athletes as they "are designed to move student-athletes towards graduation in a timely manner."[32] The NCAA's practice of starting a transfer student-athlete's Eligibility Clock one or two years prior to enrollment at an NCAA member institution and denying extended

---

[32] *See* 2024-25 NCAA Guide for Four Year Transfers (http://fs.ncaa.org.s3.amazonaws.com/Docs/eligibility_center/Transfer/FourYearGuide.pdf) at 13.

eligibility when reasons beyond athletes' control cause interruption does not advance academic progress nor guarantee timely graduation.

87.     The NCAA does not require member institutions to accept a standardized number of transfer credits from NAIA schools. As a result, academically rigorous NCAA institutions, often the very schools that athletes transfer to in pursuit of better educational opportunities, frequently reject many NAIA credits. This forces student-athletes to retake coursework incurring additional tuition, housing, and related costs and extending the time required to complete a degree while still being limited to a maximum of three years of NCAA eligibility for students who have completed part of their degree at an NAIA institution.

88.     Additionally, student-athletes who face circumstances beyond their control often experience disruptions in both their academic and athletic progress. For example, the COVID-19 pandemic significantly slowed students' advancement in the classroom and on the court as institutions and individuals struggled to adapt to unprecedented challenges. Allowing these athletes an additional season of NCAA eligibility would not undermine or be responsible for any delays in their academic careers; it would simply offer a fair opportunity to recover lost athletic development without penalizing them for disruptions they could not control. Many student-athletes transferring from NAIA institutions do, in fact, complete their degrees in a timely manner. For example, student-athletes like Mr. Boyd have graduated in good academic standing within four years. However, the restrictive NCAA Eligibility Clock disincentivizes more ambitious academic pursuits, such as dual degrees, combined undergraduate and graduate programs, or graduate-level study in general—academic paths that often require more than the two or three years of remaining eligibility NCAA rules allow.

89.     The NCAA's own academic policies acknowledge that completing a degree in more than four years is not inherently untimely. The Progress Toward Degree requirements mandate

35

only that student-athletes complete 20% of their degree each academic year clearly accommodating a five-year graduation timeline. Additionally, the NCAA routinely cites athlete graduation rates based on a six-year window. These policies demonstrate that the eligibility clock is not academically justified and undermines any claim that it serves a legitimate procompetitive purpose.

90. Further, the NAIA Eligibility Limitation Bylaws and Five-Year Rule Waiver do not advance the NCAA's claimed interest in preserving consumer demand through its "amateurism model" which purports to distinguish college athletic events from professional sporting events. The NCAA has never articulated a cohesive or consistently applied definition of amateurism. These bylaws do not implicate or relate to the NCAA's definition of amateurism in any substantive way. In any event, the NAIA Eligibility Limitation Bylaws and Five-Year Rule Waiver have no bearing on an athlete's amateur status under NCAA rules and regulations.

91. A student-athlete transferring from an NAIA institution does so as an amateur and remains an amateur upon enrollment at an NCAA institution. Denying such athletes the opportunity to compete in NCAA basketball solely because they began their academic and athletic careers at a non-NCAA school bears no legitimate connection to preserving amateur status. Additionally, suggesting that a student-athlete loses amateur status solely by participating in an additional season due to extended academic enrollment or circumstances beyond athletes' control is unfounded. The NCAA itself permits numerous exceptions under which student-athletes may compete beyond normal eligibility without undermining its asserted amateurism model. For example, students are allowed to attend a preparatory school prior to their undergraduate university without triggering the Eligibility Clock and professional athletes may attend NCAA member institutions to compete in other sports without penalty. Any argument by the NCAA to the contrary is merely pretextual and fails to justify the anticompetitive nature of the restrictions.

36

92.     Finally, the NCAA's claimed procompetitive justification of preserving competitive balance among student-athletes, the NCAA, and its member institutions is undermined by the organization's own precedents. The COVID-era eligibility exception, which allowed certain student-athletes to compete for five seasons, provides a clear example that competitive integrity was not only preserved, but enhanced when eligibility was extended. Athletes continued to perform at a high level while benefiting from NIL opportunities; the NCAA sustained its popularity and commercial appeal; and member institutions actively recruited and showcased top-tier talent generating significant financial returns.

93.     The anticipated impact of the NCAA's exception following *Pavia* is likely to confirm the same principle: extending athletic eligibility beyond the arbitrary limits imposed by the NAIA Eligibility Limitation Bylaws and the Five-Year Rule Waiver does not harm competitive balance. Rather, it allows athletes, institutions, and the NCAA to continue thriving within a dynamic and competitive market.

## IX.    Any Potential Procompetitive Justifications for the NAIA Eligibility Limitation Bylaws and the Five-Year Rule Waiver Could be Accomplished by Less Restrictive Means

94.     Even if the NCAA's purported goals of promoting academics, preserving amateurism, and maintaining competitive balance were valid procompetitive justifications, each could be achieved through less restrictive means.

95.     Modest revisions to the NAIA Eligibility Limitation Bylaws could preserve any legitimate procompetitive objectives asserted by the NCAA without imposing undue harm on NAIA transfer athletes. For example, the commencement of the Eligibility Clock under Bylaws 12.8.1 and 12.8.1.1 could be tied to an athlete's initial enrollment at an NCAA member institution, rather than any "collegiate institution," as currently written. This would mirror the NCAA's rule allowing students to attend and compete at preparatory schools without triggering the Eligibility

37

Clock and ultimately allow transfer students to experience the full four seasons of participation at the NCAA level. This less restrictive alternative would allow the NCAA to pursue its purported goals while eliminating unnecessary barriers that exclude otherwise certain eligible athletes.

96.     Additionally, the NCAA could adopt new bylaws that promote academic advancement and competitive balance without imposing unnecessarily restrictive eligibility limitations on transfer athletes. For example, for the Five-Year Rule Waiver, the NCAA could implement individualized waiver processes or establish clear and consistent policies for athletes affected by injuries or natural disaster. These measures would uphold the same institutional goals without unnecessarily excluding talented, marketable athletes from competition. Such provisions would uphold academic integrity, preserve the principles of amateurism and competitive equity, and ensure fair access to athletic opportunities and NIL compensation for transfer students while also preventing economic harm to Tennessee's NCAA member institutions.

### COUNT 1: VIOLATION OF SECTION 1 OF THE SHERMAN ACT: THE NAIA ELIGIBILTY LIMITATIONS BYLAWS

97.     Plaintiff repeats and alleges each allegation set forth in the preceding paragraphs as if fully set forth herein.

98.     Defendant, by and through its officers, directors, employees, agents or other representatives, and its member institutions, has entered an illegal agreement to restrain and suppress competition in the relevant markets through the adoption and enforcement of the NAIA Eligibility Limitation Bylaws: NCAA Bylaws 12.8.1 (the Five-Year Rule Waiver) and 12.8.1.1 (Starting the Eligibility Clock). Specifically, the NCAA and NCAA member institutions have agreed to unlawfully restrain the ability of NCAA Division I college athletes who transfer to the NCAA from a non-NCAA institution, such as the NAIA, to play for the same number of years offered to every

other college basketball player. The restraint imposed by the NAIA Eligibility Limitation Bylaws cannot withstand analysis under the rule of reason.

99.     The labor market for college basketball athletes, specifically those competing at the NCAA Division I level, is the relevant antitrust market. The transactions between NCAA member institutions and college basketball players in this market are commercial in nature and fall under the purview of the Sherman Act.

100.    This unlawful agreement among horizontal competitors has unreasonably restrained competition among schools for the college athletes competing in the relevant markets, as colleges are prohibited from retaining the services of an NAIA college transfer, like Mr. Boyd, for the four or five years they are permitted to retain the services of other college basketball players. This limitation disadvantages NAIA college basketball players seeking to transfer to an NCAA Division I college along with former NAIA college basketball players currently playing for an NCAA Division I college. Further, the limitation prevents such basketball players from realizing the benefits of competing in NCAA Division I basketball games for the same length of time available to all other college basketball players, harming their current and future earning potential.

101.    As a direct result of Defendant's conduct, NAIA college basketball players seeking to transfer to an NCAA Division I college, along with former NAIA college basketball players currently playing for an NCAA Division I college and consumers of college athletics, have suffered and continue to suffer antitrust injury due to the reduction in competition among NCAA Division I schools for college athletes through the restrictions imposed by the NAIA Eligibility Limitation Bylaws.

102.    The NAIA Eligibility Limitation Bylaws yield few, if any, benefits to competition in Division I basketball to the NCAA's member institutions, to college basketball players, or to

consumers of NCAA Division 1 basketball games. Any such benefits are far outweighed by the harm to competition and to the college basketball players who are subject to the NAIA Eligibility Limitation Bylaws. Furthermore, modest revisions to the NCAA bylaws could be made as less restrictive alternatives that accomplish the NCAA's goals.

103.    Defendant's conduct is ongoing and will continue to impose injury on Mr. Boyd, college basketball players, NCCA member institutions, and consumers of college basketball unless injunctive relief is granted. This ongoing harm from the Five-Year Rule Waiver has caused, and continues to cause, direct harm to Plaintiff by restricting his ability to sign contracts for NIL compensation extending beyond the 2024-25 basketball season, forcing him to lose a roster spot and NIL contract with Vanderbilt University estimated for $350,000, and limiting his future opportunities to showcase his skills and talent for NBA personnel, and does so as an unreasonable restraint on the labor markets for college basketball players. Mr. Boyd currently holds several 2025–26 roster spot offers from other Division I programs, which include opportunities for NIL compensation and are contingent on his eligibility being restored. Without judicial intervention, he risks losing these offers and NIL opportunities, effectively excluding him from the competitive college basketball market at the height of his value and athletic potential.

104.    Defendant and its member institutions' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

105.    Plaintiff asks for a preliminary restraining order, preliminary injunction, and permanent injunction enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8.1 and 12.8.1.1 as to Plaintiff, and from enforcing NCAA Bylaw 12.11.4.2 to punish Plaintiff any NCAA member institution for actions taken in compliance with

any orders from this Court. Plaintiff also asks the Court to explicitly rule that he is entitled to play NCAA Division I college basketball in the 2025-26 school year.

106.    Pursuant to Section 26 of the Clayton Act, 15 U.S.C. § 26, Plaintiff seeks injunctive relief to prevent further and ongoing harm caused by Defendant's anticompetitive conduct.

107.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff is entitled to recover reasonable attorneys' fees.

### COUNT 2: VIOLATION OF SECTION 1 OF THE SHERMAN ACT: FIVE-YEAR RULE WAIVER

108.    Plaintiff repeats and alleges each allegation set forth in the preceding paragraphs as if fully set forth herein.

109.    Defendant, by and through its officers, directors, employees, agents or other representatives, and its member institutions, has entered an illegal agreement to restrain and suppress competition in the relevant markets through the adoption and enforcement of the Five-Year Rule Waiver: NCAA Bylaw 12.8.1.7. Specifically, the NCAA and NCAA member institutions have agreed to unlawfully restrain the ability of Division I college athletes, who experienced interruption to their careers for circumstances beyond their control, to play for the same number of years offered to every other college basketball player. The restraint imposed by the Five-Year Rule Waiver cannot withstand analysis under the rule of reason.

110.    The labor market for college basketball athletes, specifically those competing at the NCAA Division I level, is the relevant antitrust market. The transactions between NCAA member institutions and college basketball players in this market are commercial in nature and fall under the purview of the Sherman Act.

41

111. Defendant and its member institutions' anticompetitive acts were intentionally directed at the United States market and have a substantial and foreseeable effect on interstate commerce.

112. This unlawful agreement among horizontal competitors has unreasonably restrained competition among schools for the college athletes competing in the relevant markets, as colleges are prohibited from retaining the services of a student-athlete experiencing interruption due to circumstances beyond his control, like Mr. Boyd, for the years they are permitted to retain the services of other college basketball players. This limitation unfairly penalizes college basketball players, specifically those who transfer from NAIA institutions and experience compounded limitations, whose careers are disrupted by circumstances beyond their control, such as injuries or the COVID-19 pandemic. Further, the limitation prevents such basketball players from realizing the benefits of competing in NCAA Division 1 basketball games for the same length of time available to all other college basketball players, harming their current and future earning potential.

113. As a direct result of Defendant's conduct, Mr. Boyd, like other college basketball players who experienced interruption to their careers for circumstances beyond their control, has suffered and continues to suffer antitrust injury due to the reduction in competition among NCAA Division I schools for college athletes through the restrictions imposed by the Five-Year Rule Waiver.

114. The Five-Year Rule Waiver yields few, if any, benefits to competition in Division I basketball to Mr. Boyd, to the NCAA's member institutions, to college basketball players, or to consumers of NCAA Division I basketball games. Any such benefits are far outweighed by the harm to competition and to the college basketball players who are subject to the Five-Year Rule Waiver.

Furthermore, modest revisions to the NCAA bylaws could be made as less restrictive alternatives that accomplish the NCAA's goals.

115.    Defendant's conduct is ongoing and will continue to impose injury on Mr. Boyd, college basketball players, NCCA member institutions, and consumers of college basketball unless injunctive relief is granted. This ongoing harm from the Five-Year Rule Waiver has caused, and continues to cause, direct harm to Plaintiff by restricting his ability to sign contracts for NIL compensation extending beyond the 2024-25 basketball season, forcing him to lose a roster spot and NIL contract with Vanderbilt University estimated for $350,000, and limiting his future opportunities to showcase his skills and talent for NBA personnel, and does so as an unreasonable restraint on the labor markets for college basketball players. Mr. Boyd currently holds several 2025–26 roster spot offers from other Division I programs, which include opportunities for NIL compensation and are contingent on his eligibility being restored. Without judicial intervention, he risks losing these offers and NIL opportunities, effectively excluding him from the competitive college basketball market at the height of his value and athletic potential.

116.    Plaintiff asks for a preliminary restraining order, preliminary injunction, and permanent injunction enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaw 12.8.1.7 as to Plaintiff, and from enforcing NCAA Bylaw 12.11.4.2 to punish Plaintiff and any NCAA member institution for actions taken in compliance with any orders from this Court. Plaintiff also asks the Court to explicitly rule that he is entitled to play NCAA Division I college basketball in the 2025-26 school year.

117.    Pursuant to Section 26 of the Clayton Act, 15 U.S.C. § 26, Plaintiff seeks injunctive relief to prevent further and ongoing harm caused by Defendant's anticompetitive conduct.

43

118. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff is entitled to recover reasonable attorneys' fees.

## COUNT 3: VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT: THE NAIA ELIGIBILTY LIMITATIONS BYLAWS

119. Plaintiff repeats and alleges each allegation set forth in the preceding paragraphs as if fully set forth herein.

120. The NCAA and its member institutions, by and through the NCAA Division I Manual and specifically the NAIA Eligibility Limitation Bylaws have engaged in an arrangement, contract, agreement, trust, or combination that tends to lessen full and free competition in trade or commerce affecting the State of Tennessee in violation of the Tennessee Trade Practices Act ("TTPA"), Tenn. Code Ann. § 47-25-101.

121. The NCAA member institutions adopting the NCAA's NAIA Eligibility Limitation Bylaws constitute an arrangement, contract, agreement, trust, or combination designed to and which tends to advance, reduce, or control the price or cost to the producer or consumer of services in trade or commerce affecting the State of Tennessee in violation of Tenn. Code Ann. § 47-25-101.

122. The Tennessee General Assembly's recent enactment of Senate Bill 536 ("SB 536") confirms that Tennessee antitrust law applies to collegiate athletics. The legislation expressly prohibits NCAA rules that "tend to lessen competition" with respect to student-athletes' name, image, and likeness (NIL) rights adopting language that closely tracks the Tennessee Trade Practices Act's ban on arrangements that "tend to lessen full and free competition in trade or commerce."

123. Senate Bill 536 directly targets the NCAA, prohibiting it from "establish[ing], adopt[ing], promulgat[ing], implement[ing], or enforc[ing] any rule, standard, procedure, policy, or guideline that violates an applicable state or federal antitrust law." Tenn. Code Ann. § 49-7-2802(b)(3)(C) (2025). This provision reflects the Tennessee legislature's clear and unequivocal

44

intent that the state's antitrust laws apply fully to NCAA regulations that affect student-athletes and NCCA member institutions within Tennessee.

124.     SB 536 states that the NCAA shall not "[i]nterfere with, prohibit, restrict, or otherwise adversely affect an intercollegiate athlete's ability to earn compensation . . . and shall not otherwise impact an intercollegiate athlete's eligibility or full participation in intercollegiate athletic events." Tenn. Code Ann. § 49-7- 2803(a)(1) (2025).

125.     The legislation's express declaration that any restriction which "lessens, or tends to lessen, full and free competition in trade or commerce affecting this State" is contrary to public policy operates as a legislative interpretation of the TTPA's scope. This statement affirms that the TTPA encompasses anticompetitive restraints in collegiate athletics which limits competition in the market for NCAA Division I athletic services and NIL opportunities. Read in tandem, SB 536 and the TTPA articulate a clear and consistent state policy against anticompetitive conduct in the context of intercollegiate athletics.

126.     The NCAA's NAIA Eligibility Limitation Bylaws produce substantial anticompetitive effects including but not limited to: (a) artificially restricting the labor supply by excluding a significant number of otherwise-eligible athletes from participating in the market; (b) systematically excluding high-performing and high-value athletes diminishing the overall talent pool; (c) imposing an artificial ceiling on NIL compensation by removing some of the most marketable individuals from participation; and (d) reducing the overall quality and competitiveness of collegiate athletics as a consumer product.

127.     The NCAA's NAIA Eligibility Limitation Bylaws directly affect trade and commerce within the State of Tennessee by: (a) impairing Tennessee member institutions' ability to recruit and retain top athletic talent hindering their competitiveness; (b) limiting the economic opportunities available to student-athletes within Tennessee including access to NIL compensation;

45

(c) diminishing the quality and appeal of collegiate sports products available to Tennessee consumers; (d) constraining the production and sale of merchandise associated with high-profile athletes; and (e) suppressing broader economic activity in Tennessee that derives from the collegiate athletics industry.

128.    The NCAA's asserted justifications for the challenged rule fail to withstand scrutiny under the Rule of Reason analysis governing both federal and Tennessee antitrust law.

129.    As a direct and proximate result of the NCAA's unlawful conduct, Mr. Boyd has suffered significant injury to his business and property interests within Tennessee. This includes the loss of a substantial NIL compensation opportunity valued at approximately $350,000 through a contract with Vanderbilt University—a deal that would have provided both immediate financial benefit and long-term brand building potential. In addition, Mr. Boyd has been deprived of crucial professional development opportunities, such as elite-level coaching, national exposure, and competitive experience, all of which are essential inputs to an athlete's future earning potential. Educationally, Mr. Boyd lost the opportunity to pursue a degree at a leading academic institution in Tennessee further compounding the long-term economic consequences of the NCAA's conduct. Finally, the NCAA's restrictions have prevented Plaintiff from capitalizing on his NIL rights through the production and sale of merchandise bearing his name, image, and likeness. These lost opportunities would have generated income and enhanced his visibility in Tennessee's college sports marketplace. These injuries are not speculative; they are measurable, ongoing, and not easily remedied through other channels.

130.    Additionally, Mr. Boyd is threatened with continued loss and damage that the TTPA was designed to prevent and that flows from the NCAA's unlawful conduct as he is fielding offers and opportunities for roster spots and NIL compensation with another member institutions including in Tennessee. Mr. Boyd currently holds several 2025–26 roster spot offers from other Division I

46

programs, which include opportunities for NIL compensation and are contingent on his eligibility being restored. Without judicial intervention, he risks losing these offers and NIL opportunities, effectively excluding him from the competitive college basketball market at the height of his value and athletic potential.

131.    Pursuant to Tenn. Code Ann. § 47-25-101 and Tennessee common law, Plaintiff is entitled to injunctive relief to prevent and restrain the NCAA's violations of the TTPA.

## COUNT 4: VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT: FIVE-YEAR RULE WAIVER

132.    Plaintiff repeats and alleges each allegation set forth in the preceding paragraphs as if fully set forth herein

133.    The NCAA and its member institutions, by and through the NCAA Division I Manual and specifically the Five-Year Rule Waiver, have engaged in an arrangement, contract, agreement, trust, or combination that tends to lessen full and free competition in trade or commerce affecting the State of Tennessee in violation of the Tennessee Trade Practices Act ("TTPA"), Tenn. Code Ann. § 47-25-101.

134.    The NCAA member institutions adopting the NCAA's Five-Year Rule Waiver constitutes an arrangement, contract, agreement, trust, or combination designed to and which tends to advance, reduce, or control the price or cost to the producer or consumer of services in trade or commerce affecting the State of Tennessee in violation of Tenn. Code Ann. § 47-25-101.

135.    The Tennessee General Assembly's recent enactment of Senate Bill 536 ("SB 536") confirms that Tennessee antitrust law applies to collegiate athletics. The legislation expressly prohibits NCAA rules that "tend to lessen competition" with respect to student-athletes' name, image, and likeness (NIL) rights adopting language that closely tracks the Tennessee Trade Practices Act's ban on arrangements that "tend to lessen full and free competition in trade or commerce."

136. Senate Bill 536 directly targets the NCAA, prohibiting it from "establish[ing], adopt[ing], promulgat[ing], implement[ing], or enforc[ing] any rule, standard, procedure, policy, or guideline that violates an applicable state or federal antitrust law." Tenn. Code Ann. § 49-7-2802(b)(3)(C) (2025). This provision reflects the Tennessee legislature's clear and unequivocal intent that the state's antitrust laws apply fully to NCAA regulations that affect student-athletes and NCCA member institutions within Tennessee.

137. SB 536 states that the NCAA shall not "[i]nterfere with, prohibit, restrict, or otherwise adversely affect an intercollegiate athlete's ability to earn compensation . . . and shall not otherwise impact an intercollegiate athlete's eligibility or full participation in intercollegiate athletic events." Tenn. Code Ann. § 49-7- 2803(a)(1) (2025).

138. The legislation's express declaration that any restriction which "lessens, or tends to lessen, full and free competition in trade or commerce affecting this State" is contrary to public policy operates as a legislative interpretation of the TTPA's scope. This statement affirms that the TTPA encompasses anticompetitive restraints in collegiate athletics which limits competition in the market for NCAA Division I athletic services and NIL opportunities. Read in tandem, SB 536 and the TTPA articulate a clear and consistent state policy against anticompetitive conduct in the context of intercollegiate athletics.

139. The NCAA's the Five-Year Rule Waiver produces substantial anticompetitive effects including but not limited to: (a) artificially restricting the labor supply by excluding a significant number of otherwise-eligible athletes from participating in the market; (b) systematically excluding high-performing and high-value athletes diminishing the overall talent pool; (c) imposing an artificial ceiling on NIL compensation by removing some of the most marketable individuals from participation; and (d) reducing the overall quality and competitiveness of collegiate athletics as a consumer product.

48

140. The NCAA's the Five-Year Rule Waiver directly affects trade and commerce within the State of Tennessee by: (a) impairing Tennessee member institutions' ability to recruit and retain top athletic talent hindering their competitiveness; (b) limiting the economic opportunities available to student-athletes within Tennessee including access to NIL compensation; (c) diminishing the quality and appeal of collegiate sports products available to Tennessee consumers; (d) constraining the production and sale of merchandise associated with high-profile athletes; and (e) suppressing broader economic activity in Tennessee that derives from the collegiate athletics industry.

141. The NCAA's asserted justifications for the challenged rule fail to withstand scrutiny under the Rule of Reason analysis governing both federal and Tennessee antitrust law.

142. As a direct and proximate result of the NCAA's unlawful conduct, Mr. Boyd has suffered significant injury to his business and property interests within Tennessee. This includes the loss of a substantial NIL compensation opportunity valued at approximately $350,000 through a contract with Vanderbilt University—a deal that would have provided both immediate financial benefit and long-term brand building potential. In addition, Mr. Boyd has been deprived of crucial professional development opportunities, such as elite-level coaching, national exposure, and competitive experience, all of which are essential inputs to an athlete's future earning potential. Educationally, Mr. Boyd lost the opportunity to pursue a degree at a leading academic institution in Tennessee further compounding the long-term economic consequences of the NCAA's conduct. Finally, the NCAA's restrictions have prevented Plaintiff from capitalizing on his NIL rights through the production and sale of merchandise bearing his name, image, and likeness. These lost opportunities would have generated income and enhanced his visibility in Tennessee's college sports marketplace. These injuries are not speculative; they are measurable, ongoing, and not easily remedied through other channels.

143. Additionally, Mr. Boyd is threatened with continued loss and damage that the TTPA was designed to prevent and that flows from the NCAA's unlawful conduct as he is fielding offers and opportunities for roster spots and NIL compensation with another member institutions including in Tennessee. Mr. Boyd currently holds several 2025–26 roster spot offers from other Division I programs, which include opportunities for NIL compensation and are contingent on his eligibility being restored. Without judicial intervention, he risks losing these offers and NIL opportunities, effectively excluding him from the competitive college basketball market at the height of his value and athletic potential.

144. Pursuant to Tenn. Code Ann. § 47-25-101 and Tennessee common law, Plaintiff is entitled to injunctive relief to prevent and restrain the NCAA's violations of the TTPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Derrin Boyd respectfully requests that this Court:

1. Adjudge and decree that Defendant's enforcement of the competition limitations in NCAA Bylaws 12.8.1 and 12.8.1.1 violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

2. Adjudge and decree that Defendant's enforcement of the competition limitations in NCAA Bylaw 12.8.1.7 violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

3. Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to the Clayton Act, 15 U.S.C. § 15 and 26, enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8.1, 12.8.1.1, 12.8.1.7, and 14.3.3 as to Boyd, and from enforcing NCAA Bylaw 12.11.4.2 to punish Boyd and any NCAA member institution for actions taken in compliance with any orders from this Court;

4. Adjudge and decree that Defendant's enforcement of the competition limitations in NCAA Bylaws 12.8.1 and 12.8.1.1 violates the Tennessee Trade Practice Act, Tenn. Code Ann. § 47-25-101;

5. Adjudge and decree that Defendant's enforcement of the competition limitations in NCAA Bylaw 12.8.1.7 violates the Tennessee Trade Practice Act, Tenn. Code Ann. § 47-25-101;

6. Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to the Tennessee Trade Practice Act (TTPA), Tenn. Code Ann. § 47-25-101 and

Tennessee common law, enjoining Defendant from continuing to violate the TTPA by enforcing NCAA Bylaws 12.8.1, 12.8.1.1, and 12.8.1.7 as to Boyd, and from enforcing NCAA Bylaw 12.11.4.2 to punish Boyd and any NCAA member institution for actions taken in compliance with any orders from this Court;

7. Award Plaintiff Derrin Boyd a fourth season of NCAA Division I competition and eligibility to take place in 2025-26 to avoid harm caused by NCAA Bylaws 12.8.1, 12.8.1.1, and 12.8.1.7;

8. Award Plaintiff Derrin Boyd his costs, including reasonable attorneys' fees under Section 4 of the Clayton Act, 15 U.S.C. § 15; and

9. Order any other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ Ryan P. Durham*
Ryan P. Durham (#22073)
rdurham@bhsdlaw.com
**BOSTON, HOLT & DURHAM, PLLC**
P.O. Box 357
Lawrenceburg, TV 38464
Tel: (931) 762-7167

JoAnna B. Adkisson
(admission pending/filed)
joanna.adkisson@bakerbotts.com|
Erik T. Koons (*pro hac vice* to be filed)
erik.koons@bakerbotts.com
Amanda Kusick (*pro hac vice* to be filed)
amanda.kusick@bakerbotts.com
Erin M. Schnappauf (*pro hac vice* to be filed)
erin.schnappauf@bakerbotts.com
**BAKER BOTTS L.L.P.**
700 K Street NW
Washington, DC 20001
Tel: (202) 639-7700
Fax: (202) 639-7890

Rebecca Krause (*pro hac vice* to be filed)
rebecca.krause@bakerbotts.com
**BAKER BOTTS L.L.P.**
101 California Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 291-6200
Fax: (415) 291-6300

*Counsel for Plaintiff Derrin Boyd*

51

## CERTIFICATION OF SERVICE

I hereby certify that I caused to be served, a true and correct copy of the foregoing was served upon the following persons via e-mail in addition to filing on the ECF system on the 30th day of June 2025:

Taylor J. Askew
taylor.askew@hklaw.com
Doug Minor
doug.minor@hklaw.com
David Kully
david.kully@hklaw.com
David Zeitlin
david.zeitlin@hklaw.com
**HOLLAND & KNIGHT**
511 Union Street, Suite 2700
Nashville, TN 37219
Tel: (615) 850-8113
Fax: (615) 244-6804

*/s/ Ryan P. Durham*
Ryan P. Durham

52