IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **DERRIN BOYD,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:25-cv-00729 |
| v. | ) | |
| | ) | JUDGE CAMPBELL |
| **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,** | ) ) | MAGISTRATE JUDGE HOLMES |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Pending before the Court is a Motion for Preliminary Injunction filed by Darrin Boyd.[1] (Doc. No. 10). Plaintiff seeks a preliminary injunction that will allow him to play college basketball during the 2025-26 season. Specifically, Boyd seeks an order that: (1) enjoins Defendant National Collegiate Athletic Association ("NCAA") from enforcing certain bylaws governing eligibility to preclude him from playing NCAA Division I college basketball during the 2025-26 season; (2) orders the NCAA to immediately grant a waiver of any eligibility rule that would preclude him from competing; and (3) orders the NCAA to declare him eligible to play. (*Id*.).

In support of the motion, Plaintiff filed a memorandum and a declaration by Plaintiff. (*See* Doc. Nos. 10, 11-1). The NCAA filed a response in opposition and seven exhibits, including the Declaration of Jerry Vaughn, Director of Academic and Membership Affairs at the NCAA, documents pertaining to NCAA blanket waivers, and filings and an opinion from cases challenging the NCAA eligibility requirements. (Doc. No. 23, Exs. 1-7). Plaintiff filed a reply and additional exhibits: (1) a transcript of the July 16, 2025 preliminary injunction hearing in *Bellamy v. NCAA*,

---

[1] The request for an ex parte temporary restraining order was previously denied. (See Order, Doc. No. 16).

Case No. 3:25-cv-00750; (2) a declaration of Dr. Joel Maxcy; (3) the NCAA denial of Boyd's request for extension of eligibility waiver; (4) a declaration of Derrin Boyd; and (5) a declaration of Clay Mallory. (Doc. No. 28, Exs. 1-5).

Defendant moves to strike or for the Court to decline to consider the Declaration of Dr. Maxcy, or in the alternative, for leave to file a declaration in sur-reply. (Doc. No. 31). Defendant argues the Maxcy Declaration was improperly included with the reply to substantiate Plaintiff's underlying burden of proof rather than to address arguments in Defendant's response. (*Id*.). Plaintiff responds that the Maxcy Declaration was filed in response to Defendant's argument that he cannot prevail without producing detailed economic modeling. (Doc. No. 34).

The Court agrees with Defendant that the Court may not consider new arguments and evidence raised in a reply brief. *See McGruder v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:17-cv-01547, 2020 WL 4586171, at *2 (M.D. Tenn. Aug. 10, 2020). Because consideration of the Maxcy Declaration does not affect the Court's decision on the pending motion for preliminary injunction, the motion to strike or for leave to file a sur-reply (Doc. No. 31) is **DENIED** as **MOOT**.

For the reasons stated herein, Plaintiff's motion for preliminary injunction (Doc. No. 10) is **DENIED**.

## I. BACKGROUND[2]

Plaintiff Derrin Boyd has been a college student since 2019. He attended Georgetown College for three years from 2019-2022, Lipscomb University for two years from 2022-2024, and the College of Charleston for one year from 2024-2025. These colleges are members of different athletic associations. Georgetown College is a member of the National Association of

---

[2] A more extensive discussion of the NCAA, eligibility rules, and student-athlete compensation is included in the Court's December 16, 2024, decision in *Diego Pavia v. NCAA*, 760 F. Supp. 3d 527, 544 (M.D. Tenn. 2024), which is currently on appeal.

Intercollegiate Athletics ("NAIA"). Lipscomb University and the College of Charleston are members of Division I of the National Collegiate Athletic Association ("NCAA"), which is the highest level in collegiate athletics. Division I student-athletes generally have superior training, facilities, media coverage, and other benefits as compared to student-athletes at lower levels of competition, including NAIA. Although all student-athletes are eligible to earn compensation from revenue sharing and name, image, and likeness ("NIL"), virtually all revenue sharing and NIL funds go to Division I athletes.

NCAA Division I schools have adopted regulations that govern all aspects of collegiate athletics. The Bylaws at issue in this case are those pertaining to time-limits on eligibility.

Boyd is no longer eligible to compete. At issue here are NCAA Bylaws that restrict the duration of a student-athlete's eligibility to compete to four seasons of competition within a five-year period. In relevant part, these Bylaws state:

> **12.8 Seasons of Competition: Five-Year Rule.** A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport (see Bylaws 12.02.6 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all seasons of participation in all sports within the time periods specified below:
>
> **12.8.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted. For international students, service in the armed forces or on an official religious mission of the student's home country is considered equivalent to such service in the United States.
>
> > **12.8.1.1 Determining the Start of the Five-Year Period.** For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution (domestic or foreign; see Bylaw 14.02.4) when the student-athlete initially registers in a regular term (semester or quarter) of an academic

3

year for a minimum full-time program of studies, as determined by the institution, and attends the student's first day of classes for that term (see Bylaw 12.8.2).

The NCAA Bylaws define "intercollegiate competition" as follows:

> **12.02.6 Intercollegiate Competition.** Intercollegiate competition is considered to have occurred when a student-athlete in either a two-year or a four-year collegiate institution does any of the following:
>
> (a) Represents the institution in any contest against outside competition, regardless of how the competition is classified (e.g., scrimmage, exhibition or joint practice session with another institution's team) or whether the student is enrolled in a minimum full-time program of studies;
>
> (b) Competes in the uniform of the institution, or, during the academic year, uses any apparel (excluding apparel no longer used by the institution) received from the institution that includes institutional identification; or
>
> (c) Competes and receives expenses (e.g., transportation, meals, housing, entry fees) from the institution for the competition.

Finally, a "Collegiate Institution" is defined as follows:

> **14.02.4 Collegiate Institution.** A collegiate institution (for purposes of NCAA legislation) is an institution of higher education that:
>
> (a) Is accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree;
>
> (b) Conducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree; or
>
> (c) Is located in a foreign country.

Taken together, these NCAA Bylaws allow a student-athlete to engage in intercollegiate athletic competition for four seasons within five consecutive calendar years. Effectively, there are two "clocks" on a student-athlete's eligibility: (1) the intercollegiate competition clock

4

(hereinafter, "seasons of intercollegiate competition") allows four years of intercollegiate competition at a "collegiate institution"; and (2) the eligibility clock or "period of eligibility" allows student-athletes to compete within a five-year period which begins when the student-athlete begins full-time study at a "collegiate institution." Seasons of intercollegiate competition accrue when a student engages in competition at a collegiate institution. If a student does not compete during a season, that season does not "count" for purposes of the four-year intercollegiate competition clock. The period of eligibility, however, begins to run when a student-athlete begins full-time study at a collegiate institution whether or not they engage in intercollegiate competition, and continues to run, with limited exceptions, for five calendar years.

On December 23, 2024, following this Court's grant of preliminary injunction in *Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024), the NCAA issued a blanket waiver to "permit student-athletes who attended and competed at a non-NCAA school for one or more years to remain eligible to compete in 2025-26 if those students would have otherwise used their final season of competition during the 2024-25 academic year, and meet all other eligibility requirements (e.g., progress toward degree, five-year period of eligibility)."[3] (*See* Report of the NCAA Division I Board of Directors, Dec. 23, 2024, Doc. No. 23-5; NCAA Division I Board of Directors Waiver Guidance, Doc. No. 23-6). This blanket waiver which has been referred to as the "Pavia Waiver," provided relief from the four seasons of intercollegiate competition portion of the Bylaws, but not the five-year eligibility clock. The blanket waiver does not apply to Boyd who has exhausted his seasons of competition and period of eligibility.

---

[3] The NCAA appealed the preliminary injunction order. *See Pavia v. NCAA*, Case No. 24-6153 (6th Cir.). The appeal remains pending.

Separate from the Pavia Waiver, the NCAA Division I Bylaws include provisions under which a student-athlete may be granted a waiver of time limits on eligibility. *See* NCAA Bylaw 12.8.1.7 (setting forth circumstances under which a waiver may be deemed appropriate due to circumstances beyond the control of the student-athlete or institution).

During Boyd's six years as a college student, he succeeded academically and athletically. He earned a bachelor's degree in May 2023 and a Master of Business Administration in May 2024 from Lipscomb University, and a graduate certificate in urban and regional planning from the College of Charleston in May 2025. (*See* Second Boyd Decl., Doc. No. 28-4 at ¶¶ 1-2).

Except for the 2019-20 season when he "redshirted" (*i.e.*, did not compete), he played basketball for each of the colleges he attended and earned accolades for his performance. (*See* First Boyd Decl., Doc. No. 10-1). During the 2020-21 season, he earned First Team All-Mid-South Conference honors and was named Mid-South Freshman of the Year. (*Id*. at ¶ 4). The next season, he was named Mid-South Conference Outstanding Player of the Tournament and received NAIA All-America Honorable Mention recognition. (*Id*. ¶ 5). During his two years at Lipscomb University, he was the second leading scorer both years and was named to the All-ASUN Second Team in 2023-24, but suffered a season-ending injury after 22 games.[4] (*Id*. at ¶¶ 6-7). As a graduate student at College of Charleston in 2024-25, Boyd earned All-CAA Third Team Honors. (*Id*. at ¶ 8).

During the 2024-25 season at College of Charleston, Boyd earned Name, Image, and Likeness ("NIL") Compensation in the amount of $120,000. (*Id*. at ¶ 9). Unsurprisingly, he wants to continue his career as a student-athlete. Vanderbilt University offered him $350,000 to join its

---

[4] In comparison, Boyd played 24 games in 2020-21; 33 games in 2021-22; 33 games in 2022-23; and 31 games in 2024-25. (First Boyd Decl., Doc. No. 10-1, at ¶¶ 4, 5, 6, 8).

basketball program for the 2025-26 season. The only problem is that under the NCAA Bylaws, Boyd has no remaining eligibility – he has exhausted both his four years of competition and five years of eligibility. He sought a waiver from the NCAA, but it was denied. (*See* Doc. No. 1-1). Due to uncertainty regarding his eligibility, Vanderbilt gave the roster spot they offered to Boyd to someone else, but other NCAA Division I basketball teams have offered for him to join their programs, contingent on his eligibility. (First Boyd Decl., Doc. No. 10-1 at ¶¶ 10-11). Boyd estimates he can earn $350,000 in NIL Compensation if eligible to play in 2025-26. (*Id*. at ¶ 12; *see also*, Mallory Decl., Doc. No. 28-5).

Boyd challenges the application of the Bylaws concerning seasons of competition and seasons of eligibility to his enrollment and competition at Georgetown College as an unreasonable restraint on trade in violation of the Sherman Act. He also challenges the Bylaw allowing for waiver of the eligibility time limits on the same basis.

## II. STANDARD OF REVIEW

"To secure a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *EOG Resources, Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (citing *Winter v Nat. Rs. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Id*. at 883. (citing *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024)). The relief is *preliminary* – "it does not conclusively resolve anything – that's what final judgment is for." *Id*. "The preliminary injunction simply puts the case in a holding pattern and 'balance[s] the equities as the litigation moves forward.'" *Id*. (citing *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)).

"Because a preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right,' the plaintiff must make a 'clear showing' that these factors favor him." *Id*. (citing *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024)). The movant "faces a burden of proof 'more stringent than the proof required to survive a summary judgment motion.'" *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020). Regarding the evidentiary burden, "Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with more than 'scant evidence' to substantiate their allegations." *Doe #11 v. Lee*, 609 F. Supp. 3d 578, 592 (M.D. Tenn. 2022) (citing *Libertarian Party of Ohio v. Husten*, 751 F.3d 403, 417 (6th Cir. 2014) and collecting cases).

A failure to establish a likelihood of success on the merits "'is usually fatal' to a plaintiff's request for preliminary injunction." *Enchant*, 958 F.3d at 539 (quoting *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)). But even if the plaintiff shows a likelihood of success on the merits, "a preliminary injunction does not issue as a matter of course." *EOG Resources*, 134 F.4th at 883 (citing *Benisek v. Lamone*, 585 U.S. 155, 158 (2018)). "The plaintiff must also show that some irreparable harm will take place without the court's immediate intervention." *Id*. ("While the *extent* of an injury can be balanced against other factors, the *existence* of an irreparable injury is mandatory."). In considering the balance of equities, the Court "balance[s] the competing claims of injury[,] … consider[ing] the effect on each party of the granting or withholding of the requested relief." *EOC Resources*, 134 F.4th at 886 (citing *Winter*, 555 U.S. at 24).

"As a general rule, the law requires that 'losses should remain where they fall until an adequate legal or equitable justification for shifting them has been demonstrated.'" *EOG*

8

*Resources*, 134 F.4th at 884 (citing *Higuchi Int' Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 404 (6th Cir. 2024)).

"[A] hearing is only required when there are disputed factual issues, and not when the issues are primarily questions of law." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007) (citing *Lexington–Fayette Urban County Gov't v. BellSouth Telecomm., Inc.*, 14 Fed. Appx. 636, 639 (6th Cir. 2001) (Rule 65 "does not require the presentation of oral testimony ... particularly ... when the issues litigated are primarily questions of law.")). The parties have not requested a hearing and, having reviewed the record, the Court finds there are no disputes of material fact that necessitate a hearing.[5]

### III. ANALYSIS

Boyd seeks a preliminary injunction to (1) enjoin the NCAA from enforcing Bylaws 12.8 (allowing four seasons of intercollegiate competition within five calendar years) as it applies to his time spent at Georgetown College, an NAIA institution; (2) order the NCAA to immediately grant a waiver of any eligibility rule that would preclude him from engaging in intercollegiate competition in the 2025-26 season based on his time spent at Georgetown College; and (3) order the NCAA to declare him eligible to play during the 2025-26 season.

**A. Likelihood of Success on the Merits**

Boyd argues that the Bylaws counting his time attending and competing at an NAIA college toward the eligibility time limits and the Bylaw allowing for waiver of those time limits constitute an unreasonable restraint on trade in violation of Section 1 of the Sherman Act of 1890 ("the Sherman Act").[6] The Sherman Act provides that "[e]very contract, combination in the form

---

[5] *See* Doc. Nos. 10, 11, 23, 28, 41.

[6] Plaintiff also brings claims under the Tennessee Trade Practices Act ("TPPA"), Tenn. Code Ann. § 47-25-101. (*See* Complaint, Doc. No. 1). The motion for preliminary injunction, however, gives the

9

of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To succeed under Section 1 of the Sherman Act, Plaintiff must show that the NCAA "(1) participated in an agreement that (2) unreasonably restrain[s] trade in the relevant market." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003).

The parties agree that the rule of reason presumptively applies. (Pl. Mem., Doc. No. 11 at 11; Def. Resp., Doc. No. 23 at 14). Under the rule of reason, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 97 (2021). Plaintiff can demonstrate a substantial anticompetitive effect directly or indirectly. *American Express,* 585 U.S. at 542. Direct evidence of anticompetitive effect is "'proof of actual detrimental effects [on competition],' such as reduced output, increased prices, or decreased quality in the relevant market." *Id*. (citations omitted). Indirect evidence is "proof of market power plus some evidence that the challenged restraint harms competition." *Id*. (citations omitted).

If the plaintiff carries his burden to show a substantial anticompetitive effect, the burden then shifts to the defendant to show a procompetitive rationale for the restraint. *Alston*, 594 U.S. at 97. If the defendant can make that showing, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means. *Id*. The Supreme Court has cautioned, however, that "antitrust law does not require businesses to use anything like the least restrictive means of achieving a legitimate business purpose" and that courts should not "second-guess 'degrees of reasonable necessity.'" *Id*. at 98.

---

TPPA only passing mention, so the Court considers only the Sherman Act claim. (*See* Pl. Motion for Preliminary Injunction, Doc. No. 10 at 1; Pl. Mem., Doc. No. 11 at 1).

For the most part, Boyd's arguments parallel the Court's analysis in this Court's Order granting a preliminary injunction in *Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024). The major differences are: (1) Boyd has exhausted both the four years of intercollegiate competition and the five-year period of eligibility, whereas Pavia had one year remaining on the eligibility clock; (2) Boyd challenges the "counting" of his years of attendance and competition at Georgetown College, a four-year degree granting institution that is a member of the NAIA whereas Pavia challenged the "counting" of his years of competition at New Mexico Military Academy, a two-year junior college from which he could not earn a four-year degree; (3) Boyd challenges the Bylaw allowing waiver of the time-limits to eligibility; Pavia did not challenge that Bylaw.

Here, Boyd identifies the relevant market as the labor market for NCAA Division I basketball athletes. He barely eeks out an argument that counting time at an NAIA institution has an anticompetitive effect on the labor market for NCAA Division I basketball athletes. He argues that "denial of eligibility" based on counting his attendance at a non-NCAA institution "unreasonably restrains him from participating in the competitive and economic opportunities of playing Division I basketball and earning significant NIL income." (Doc. No. 11 at 12). But allegations of personal harm are insufficient to show harm to the *market* for NCAA Division I basketball athletes. His next argument is more plausibly tied to the market. He argues that counting attendance at NAIA schools toward the five-year period of eligibility "creates a disincentive for high school athletes to choose NAIA institutions," seemingly over other post-high school paths (*Id*. at 13 (arguing that NAIA attendance reduces future NCAA eligibility while certain other paths do not)).

What is missing is any evidence or analysis concerning how this advantage results in harm to the labor market. The arguments asserted in the reply memorandum are more developed. There,

11

Boyd argues that counting NAIA enrollment and competition toward the eligibility time limits suppresses competition among student-athletes by "limit[ing] athlete mobility and earning potential by categorically disqualifying players from a fourth year of Division I eligibility, precisely when their NIL value is often at its peak." (Doc. No. 28 at 9). Boyd also argues that the Bylaws pressure student-athletes to enroll at NCAA institutions solely to preserve eligibility, even where non-NCAA schools like junior colleges or NAIA institutions may offer stronger academic or athletic fits. (*Id*. (citing *Pavia*, 760 F. Supp. 3d at 539)). Boyd also argues that counting time a NAIA colleges against NCAA eligibility makes it "nearly impossible" for NAIA schools to compete for elite recruits. (*Id*. at 10).

Presumably in support of his position that counting NAIA time toward NCAA Division I eligibility has a substantial anticompetitive effect on the market for Division I basketball players, Plaintiff filed the Declaration of economist Dr. Joel Maxcy with his reply. (*See* Doc. No. 28-2). But Dr. Maxcy does not address whether the Bylaws affect competition between NAIA schools and NCAA Division I schools for college basketball players. (*Id.*). Dr. Maxcy argues the anticompetitive effect is something else – that by imposing time limits on eligibility and "systematically remov[ing] the most productive and valuable participants from the market," NCAA member institutions prematurely remove a "meaningful segment of top earners from the labor market" and "effectively cap the upper end of the compensation scale." (*Id*. at ¶ 41). In other words, Dr. Maxcy asserts an anticompetitive effect of *all* time-limits, arguing that by "cutting off labor market access after five years, the [Bylaws] prevent NCAA athletes … from realizing the full market value of their personal brands during their most valuable year." (*Id*. ¶ 39). In fact, Dr. Maxcy says almost nothing about the effect of "counting" time at NAIA colleges on the market or NCAA Division I basketball players. (*Id*.).

Boyd has not provided any logical argument or evidence to suggest that the Bylaw allowing waiver of the time-limits on eligibility has a substantial anticompetitive effect on the labor market or anything else. His argument is limited to the effect of the denial of a waiver as to him, which does not show harm to the market as a whole. *See Forqurean v. NCAA*, 143 F.4th 859 (7th Cir. 2025) (plaintiff's "reli[ance] solely on his own exclusion from participating in college football as proof of anticompetitive effects" insufficient to show policy has anticompetitive effects on the market). Accordingly, the Court does not find a likelihood of success on the merits of an antitrust challenge based on the Bylaw allowing waiver of the time-limits on eligibility.

Even if the Court assumes Boyd has identified a relevant market (the labor market for NCAA Division I basketball athletes) and that he has shown the time-limits on eligibility have a substantial anticompetitive effect on the labor market, *see Pavia*, 760 F. Supp. 3d at 540 ("restrictions on who can compete (and earn NIL compensation) and for how long necessarily have anticompetitive effects"), his arguments fail the next steps in the rule of reason analysis.

The NCAA asserts several procompetitive rationales for the challenged rules. First, limiting the amount of time college athletes can compete in collegiate athletics to four years within a five-year period ensures that a class of college students exits so that high school senior student-athletes have an opportunity to enter. Second, the time-limits are necessary for Division I collegiate athletics to exist as a product distinct from professional athletics. Third, the time limits foster better alignment between Division I athletics and academics.

The NCAA contends that the eligibility Bylaws are necessary to create the product of college athletics as distinct from professional sports and that part of this product is that college sports are played by college students and that college students do not remain in college forever. Instead, the Bylaws limit their eligibility to a time roughly tied to standard degree progression.

13

The NCAA argues that the eligibility restrictions are of particular importance now that revenue sharing and NIL compensation incentivize student-athletes to remain in college as long as economically lucrative. If allowed to do so, not only will this lead to the crowding out of prospective DI athletes from high school, it will dramatically reduce the natural cycle of student-athletes, and eliminate an important distinction between college sports and professional sports.

Boyd contends that these asserted justifications are not valid.[7] He points to the NCAA's exemption of "certain post-secondary activities such as prep schools, military academies, and professional participation in other sports, from triggering the eligibility clock," and argues the same exemptions should apply to student-athletes who attend NAIA institutions because "[a]thletes in these exempt categories often compete at comparable or higher levels than NAIA schools, but only NAIA athletes lose eligibility time for similar participation." (Doc. No. 28 at 11). Boyd also argues that NCAA Division I programs recruit players other than high school athletes and notes that when Vanderbilt University decided to fill the roster sport it had offered to Boyd, that spot did not go to a graduating high school student, it went to George Kimball III, a rising junior from Eastern Kentucky University, a NCAA Division II institution. (*Id*. at 12 (citing Doc. No. 28-4)). Finally, Boyd argues that the NCAA's assertion that the eligibility rules align athletics with education is "plainly pretextual" because college admissions are "already competitive" and "meritorious student-athletes such as Boyd [should have] the same opportunity to compete for a roster spot, particularly when those positions come with substantial commercial and educational benefits." (*Id*.).

---

[7] Plaintiff's memorandum in support of the motion for preliminary injunction anticipates three procompetitive rationales not asserted by the NCAA in this case: (1) promoting academic progress; (2) facilitating timely graduation; (3) preserving amateurism; and (4) maintaining competitive balance. (*See* Doc. No. 11 at 15-16).

14

Although the parties address the time-limits on eligibility in toto, the Court finds it appropriate to distinguish between the Bylaws restricting intercollegiate competition to four years (Bylaw 12.8) and the Bylaws requiring that "[a] student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution." (NCAA Division I Bylaw 12.8.1).[8] For purposes of the instant motion, the Court focuses on the five-year requirement, specifically the "counting" of time enrolled at an NAIA institution. (Bylaw 14.02.4). For the most part, Boyd does not challenge the NCAA's asserted justification as to this aspect of the eligibility rules. He argues only that the NCAA's decision to start the five-year eligibility clock upon enrollment at an NAIA institution is "inconsistent" with the exclusion of certain other post-secondary activities. The Court disagrees. Unlike both NCAA Division I and NAIA institutions, both of which confer four-year bachelor's degrees, the activities excluded from "counting" (military service, professional participation in other sports, and prep schools) do not confer degrees, and only the prep school is an educational institution, albeit not one educationally comparable to a four-year college.

Boyd notes that the Court has previously observed the logical inconsistencies of the rules excluding competition at prep schools while counting competition at two-year junior colleges, especially when those athletes compete against one another. The same concerns do not apply here, in part, because that analysis focused on the application of the Bylaws allowing only four years of competition, rather than the five-year requirement which pertains to status as a student irrespective of athletic competition. Moreover, unlike junior colleges which do not award four-year bachelor's

---

[8] Boyd also challenges the Bylaws limiting intercollegiate competition to four-years and counting competition at NAIA institutions, but because he is not eligible to compete unless none of these rules restrict his eligibility.

15

degrees, NAIA and NCAA Division I institutions are both four-year degree granting institutions. For purposes of deciding who is a college student, there is no inconsistency in "counting" enrollment at an NAIA college.

The Court finds the NCAA has shown a procompetitive rationale for the time-limits on eligibility and for applying those time limits, particularly the five-year period of eligibility, to students attending NAIA colleges. Therefore, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

Boyd argues the NCAA can achieve any legitimate procompetitive justifications "without imposing undue harm on NAIA transfer athletes" by tying eligibility to an athletes' initial enrollment at an NCAA member institution or could adopt new bylaws that "promote academic advancement without imposing unnecessarily restrictive eligibility limitations on transfer athletes." (Doc. No. 11 at 17). Boyd proposes these new bylaws would include "an individualized waiver process" or "clear and consistent policies for athletes affected by injuries or natural disasters." (*Id.*).

At this juncture, Boyd has not shown that the NCAA can achieve its procompetitive justifications by starting the five-year eligibility period only upon enrollment at an NCAA member institution, which would have the potential to extend the "career" of a student-athlete far beyond that of a typical student. Boyd himself seeks only one more year of eligibility; but the antitrust inquiry is not specific to Boyd, it concerns the market as a whole. Boyd's proposal potentially opens up an additional four years of NCAA Division I eligibility. Without further evidence and analysis, the Court is not persuaded that the NCAA's asserted procompetitive efficiencies can be achieved with Boyd's proposed modifications to the eligibility rules.

At this juncture, Boyd has not shown he is likely to succeed on the merits of his antitrust challenge. Accordingly, this factor does not support the grant of a preliminary injunction. *See Enchant*, 958 F.3d at 539 ("A finding that there is simply no likelihood of success on the merits is usually fatal to a plaintiff's quest for a preliminary injunction.") (internal quotations omitted).

B.  **Irreparable Injury**

Even if a plaintiff has shown a likelihood of success on the merits, which Boyd has not, "a preliminary injunction does not follow as a matter of course." *EOG Resources*, 134 F.4th at 883 (citing *Benisek v. Lamone*, 585 U.S. 155, 158 (2018)). "A plaintiff must also show that some irreparable harm will take place without the court's immediate intervention." *Id*.

Boyd argues that he will be irreparably harmed if unable to play another year of college basketball. (Doc. No. 11 at 17). The Court accepts that the experience of playing college sports is not one that can be readily compensated with monetary damages. In fact, the Court has previously concluded, as many other courts have, that the denial of the ability to play sports is irreparable harm. *Pavia*, 760 F. Supp. 3d 527, 544 (M.D. Tenn. 2024) (citing *Ohio*, 706 F. Supp. 3d at 597 ("Courts have repeatedly found that '[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports.'") (collecting cases)). Boyd points to lost opportunities to form lasting relationships with teammates, for personal growth, exposure, building a personal brand, and potentially creating additional career avenues. It bears mentioning, however, that much of the harm on which Boyd appears to be focused is the lost financial opportunity – the chance to pursue a graduate degree and the opportunity for "life-changing" NIL compensation. (*See* Doc. No. 11 at 19-20).

Defendant argues Boyd cannot claim irreparable harm because he unreasonably delayed seeking the instant relief. (Doc. No. 23 at 36). Defendant argues that Boyd has known for years –

since at least 2022-23 season when he arrived at Lipscomb University – that his time at Georgetown College counted toward his NCAA Division I eligibility and that he would, therefore, exhaust his eligibility following the 2024-25 academic year. The NCAA points to Bylaw 12.7.2.1, which requires student-athletes to submit a signed statement that provides information related to eligibility and to acknowledge that they are "responsible for knowing and understanding the application of all NCAA Division I regulations related to [their] eligibility."[9] Defendant argues that the three-year delay shows any urgency to Boyd's request for preliminary injunction is of his own making and that his assertion of lost opportunity to play professionally is speculative, at best.

The Court agrees Boyd has shown irreparable harm, but finds this showing is tempered by the delay in seeking relief. To be sure, his perception of the value of a season of play may have evolved since he began his Division I career, but the failure to seek redress until now suggests a lack of urgency for relief. *See* 11A Charles A. Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2948.1 (3d ed. 2018) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").

### C. Balance of Equities & Public Interest

Boyd argues granting the requested relief will not impose a significant burden on the NCAA, as it applies only to a single NAIA transfer student, not a broad class of athletes, and does not undermine the NCAA's regulatory framework. He also asserts the relief will not harm any other individual or entity and that enforcing the antitrust laws is in the public interest.

---

[9] *See* NCAA Student Athlete Statement – Division I, *https://ncaaorg.s3.amazonaws.com/compliance/d1/2025-26/2025-26D1Comp_Form25-1a-StudentAthleteStatement.pdf* (last visited Aug. 5, 2025).

The NCAA urges the Court to consider that granting a preliminary injunction to even one athlete results in sweeping new challenges to the eligibility rules, which impact opportunities available to almost 200,000 Division I student-athletes. The NCAA also argues that, given the fixed number of roster spots for Division I basketball teams, granting eligibility to Boyd allows him to play another year at the expense of another eligible player.

Under the circumstances here, the balance of equities weighs against granting a preliminary injunction. Importantly, Boyd has not shown a likelihood of success on the merits. In addition, although he has shown irreparable harm, the bulk of the asserted harm is loss of access to the substantial NIL opportunities, which is monetary harm that can be redressed at a later stage. Allowing Boyd another season of eligibility will almost certainly come at the expense of another eligible player. *See e.g.*, *Zeigler v. NCAA*, Case No. 3:25-cv-226, 2025 WL 1671952, at * 5 (E.D. Tenn. Jun. 12, 2025) ("given the fixed number of roster spots available for each Division I basketball team, an injunction would run the risk of harming (1) currently-enrolled Division I basketball players who have already committed to a member institution and (2) current high school seniors who might have their college recruitment disrupted"). Finally, although the Court has recognized that "the public interest is served by promoting free and fair competition in the labor markets" *see Pavia*, 760 F. Supp. 3d at 544, as the requested relief affects only Boyd, this factor does not weigh heavily in the Court's consideration.

## IV. CONCLUSION

For the reasons stated, Plaintiff has not shown that immediate relief is warranted. Accordingly, the motion for Preliminary Injunction (Doc. No. 10) is **DENIED**. The motion to strike the Declaration of Joel Maxcy (Doc. No. 31) is **DENIED as MOOT**.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE